## VALLEY RY. CO. v. KEEGAN.

(Circuit Court of Appeals, Sixth Circuit. April 5, 1898.)

No. 485.

1. MASTER AND SERVANT—RAILWAY EMPLOYE—MAINTAINING SAFE ROADBED.
No general duty rests upon a railway company to lay planks between the rails of its tracks; but if, for any reason, it does so, the work must be done and maintained in such a way as to be reasonably safe for persons rightfully upon the tracks and in the exercise of due care.

2. SAME—EVIDENCE.
Where a railway company has accepted its street rights on condition that it will plank between its rails those portions of the public streets used by it, and one of its employés is injured by reason of an alleged defect in the planking, it is not reversible error to admit evidence of the condition upon which the company acquired its street rights.

8. SAME—ASSUMPTION OF RISK.
Where a railway employé, whose duties for two months have been to couple cars in a railway yard a mile long and containing 22 tracks, was injured through catching his foot in a hole between the rails, which hole had existed for two months, the court is not, under the facts of this case, justified in holding, as a matter of law, that he had assumed the risk in-cident to such defect.

4. SAME.
Before a court may presume, as a matter of law, that an employé as-sumes the risks incident to defective machinery or roadbed, it must appear that he accepted employment with actual knowledge of such defect, or continued in service after he knew or should have known of the danger.

5. SAME—PRESUMPTION OF KNOWLEDGE.
To justify the presumption that a railway employé knew of a dangerous defect in the roadbed, it must appear that the defect and its danger were obvious to cne at all attentive.

6. SAME—FACTS TO BE CONSIDERED BY JURY.
If defects similar to the one complained of existed at all similar places in the same railway yaid, that fact should be considered by the jury as

87 F.—54

bearing upon the question whether an employé was chargeable with knowledge of such defect.

In Error to the Circuit Court of the United States for the Eastern Division of the Northern District of Ohio.

This is an action of tort for personal injuries sustained by the defendant in error while in the employment of the plaintiff in error. At the trial it appeared that the defendant in error, William J. Keegan, was a brakeman, and as such was a member of a switching crew employed in the yard of the railway company at Cleveland, Ohio. While engaged in making a coupling, his foot was caught in a hole between the rails, and before he could extricate himself he was knocked down and run over. Keegan had been employed in the yard of the railway company in different capacities for several years before this injury. The yard of the company was very extensive, having a length of about six miles, and was occupied by several hundred tracks, including spurs, switches, and dock tracks. For some two months prior to this accident he had been a brakeman for a switching crew employed at a particular part of the general yard, called the "Island Yard," though this also was quite extensive and contained about 22 tracks, great and small. Two of the principal of these "Island Yard" tracks occupied portions of a public street called "West River Street." The injury to Keegan occurred where these tracks crossed the sidewalk of the street. At this crossing, and in the street, the tracks were planked between the rails. Just at the outer side of the sidewalk there was a space between this planking and the rail of between three and three-quarters and four inches in width at its widest part and a depth of seven inches. Keegan's business was to make all couplings which fell to his crew. He was at this time engaged in coupling a stationary car which stood just at the edge of the sidewalk to some cars which had been started by gravity towards the standing car, and were approaching at a speed of about two miles per hour. The evidence tended to show that there was a link and pin in each of these opposing drawheads. Finding the pin fast in the stationary car, he walked towards the moving car, removed the link, and set the pin, and then undertook to step out from between the cars, intending to guide the link of the stationary car from the outside. As he stepped to one side, his foot was caught in the space between the planking and rail so tightly that with his utmost exertion he could not remove it before it was run over and crushed.

At the conclusion of all the evidence the plaintiff in error requested the court to instruct the jury to find for the defendant. This was refused. It also preferred a number of other requests. Among them were two numbered 10 and 11, which were refused. These requests involve the principal question upon which the case must turn, and are as follows:

"(10) Defendant further requests the court to instruct the jury that if they shall find that the plaintiff was employed as brakeman by the defendant, and as such brakeman charged with the duty of coupling and uncoupling cars at the time he was injured; that he had been engaged in service of the defendant, the Valley Railway Company, in the yards of said company in the city of Cleveland, as brakeman or conductor, for three years prior to the accident, and in the yard where the collision happened for two months immediately preceding said accident; that during said two months the space between the planking and the rails in said yard was not blocked; that the planking of which the plaintiff complains was, during said time, in the same condition and position as at the time of the injury; that during said two months the plaintiff frequently passed over and along the place where he was injured; that the condition and position of the planking was plainly visible, and the space between it and the rail in plain sight,—he will be conclusively presumed to have had knowledge of the condition of said track and planking, and must be held to have assumed the dangers and risks incident to the use thereof.

"(11) Defendant further requests the court to instruct the jury that the plaintiff assumed all the risks and dangers incident to the business of the defendant which were obvious and apparent, or of which he was advised,

or of which in the exercise of ordinary care on his part he might have known, and if the plaintiff continued in the employment of the defendant with the knowledge or with the reasonable opportunity of knowing that the defendant had not blocked the space between the planking and the rails, and that the plank in question was from three and one-half to four inches removed from the rail next adjacent thereto, and that it was warped, rotten, or out of repair, he assumed the risks attendant upon the use of such planking and track, and cannot recover in this action."

There was a jury, who found a verdict for Keegan, and the defendant has sued out this writ of error from the judgment thereon.

Kline, Carr, Tolles & Goff, for plaintiff in error.
Meyer & Mooney, for defendant in error.

Before TAFT and LURTON, Circuit Judges, and SEVERENS, District Judge.

LURTON, Circuit Judge, after making the foregoing statement of facts, delivered the opinion of the court.

While there is no general duty to plank between the rails, yet this railway company accepted its street rights on condition that it would plank between its rails those portions of the public streets used by it. This duty was undoubtedly imposed for the benefit of the public, who had an equal right to the use of the street. Nevertheless, if the railway company undertook to plank between the rails, it was under a duty to so put down the plank, and so maintain them when down, as that they should be reasonably safe to its employés who might be required to work thereon. This action is not for a failure to put down planking, but is for original negligence in construction or negligent maintenance when down. The company may have been under no obligation to its employés by reason of its contract with the city of Cleveland for failing to plank as required by that contract. But it was under obligation, if it did plank between its rails at street crossings, to so do the work and so maintain it when down as that it should be reasonably safe to its employés who might be required to pass over it in the discharge of their duties, provided they themselves were in the exercise of due care. It was a question for the jury, under the facts in evidence, to say whether the hole in which the foot of defendant in error was caught was a dangerous defect in the roadbed. Hannah v. Railroad Co., 154 Mass. 529, 28 N. E. 682. It was not reversible error, therefore, to admit evidence of the condition upon which the company had acquired its street rights.

Was the hole in which Keegan's foot was caught such an obviously dangerous defect in the roadbed as that, in view of Keegan's long employment in this yard, the court should have directed a verdict against him or given the special instructions asked by plaintiff in error which have been set out in the statement of the case? The learned trial judge who heard all of the evidence, and who has had much experience in such trials, was not satisfied that this question should be taken from the jury. After speaking of the duty of the railway company towards the public who might use the street occupied or crossed by the company's tracks, he instructed the jury as follows:

"As to the employés of the defendant company, it did owe the same duty as to the public. As to the employés, even if you find the original construc-

tion was not reasonably safe, or, as maintained at the time of the accident, if you find it was not reasonably safe, yet, if you further find that the employé knew of such defective or dangerous condition, or if you find the condition was obvious and patent, and could have been seen by the employé by the exercise of ordinary care, or that the employé, by the exercise of ordinary care, should have known of it, and, notwithstanding such knowledge or opportunity for knowledge, still continued in the service of the defendant, then he assumed the risk of an accident from such defective condition, and cannot recover. It becomes, therefore, important for you to determine whether or not this was such an obvious defect as the plaintiff ought to have observed. In determining this question, you will look to how patent and open it was; how easily it could be seen; what opportunities the plaintiff had for seeing it; how long he served in the yard or in the neighborhood of the yard; under what circumstances he passed over the place; whether he passed over and around and about this crossing; when he had opportunities for observing it; or when he should have observed it, knowing how often his work would bring him there; or whether he was only about it when in the performance of his duty; and whether that duty was of such a character as to make it unlikely that he would have a chance to notice this obvious defect. All these are facts which you must consider in determining whether or not this was an obvious and patent defect, of which the plaintiff had notice, or of which he ought to have had notice by the exercise of ordinary care. And in this same connection you will remember that it is claimed that the proof shows that upon all the curves on these switches in and about this yard the defendant laid a straight-edged plank near the rail, so that, while the ends of the plank were from two to two and one-half inches from the inside of the rail, the center of the plank was three and one-half to four inches from the inside of the rail. This is an important fact for you to consider in determining whether or not the plaintiff knew or ought to have known of this obvious defect, because if all the planks were laid in that way, and that was the defendant's standard of construction, then there is all the more reason why the plaintiff ought to have had knowledge of that fact. If it was only one plank that was laid that way, he might not be expected to observe that particular place and location; but if all the planks were laid that way, and he knew it, then there was the more reason why he should have known of this particular defect, and have been on his guard. If you find from the proof that the defendant did not lay this plank in a manner to make it reasonably safe for employés, and that such defect was not an obvious one, and the plaintiff did not know of it, or by the exercise of ordinary care could not have known of it, then the defendant will be liable, and you should find a verdict for the plaintiff. But even if you find that the plank was not laid so as to be reasonably safe, but yet further find that the plaintiff knew of that fact, or by the exercise of such care as I have described ought to have known of it, and notwithstanding that defect continued in the service of the defendant, then he cannot recover. Or, if you find that the defendant did not lay this plank so as to make it reasonably safe, and yet further find that the plaintiff in coupling said car did not exercise the care that a prudent man would do under the circumstances,—that is, that he did not look where he was stepping,—and that the want of such care was the proximate cause of the injury, so that he thereby contributed to his injury, then the plaintiff cannot recover."

We have given careful attention to the facts which relate to this branch of the defense, and have reached the conclusion that there was no error in refusing to direct a verdict, and none in declining the instructions asked as to the obviousness of the defect in the roadbed which was the occasion of Keegan's hurt. The circumstances were such as to make the question one proper for the jury, and the charge on this subject was a clear and full exposition of the law, and quite as favorable as the plaintiff in error was entitled to have.

The argument in favor of the contention that the hole in which

Keegan's foot was caught was an obviously dangerous defect has chiefly been rested upon the claim that it was not an unusual or isolated space, but such a one as existed at all of the curves in the yard, and was a fault, if any, in original construction, due to the placing of straight-edged planking between curved rails, causing thereby a wider space between the plank and the rail at the center of the plank than at its ends. Of course, if such spaces existed at the center of all planks laid between curved rails in this yard, the obviousness of the existence of such spaces, and their dangerous character to employés compelled to pass frequently over them, would be much more maintainable than if this particular hole was an isolated instance. The trial judge gave attention to this fact, and instructed the jury that, if all planks at curves were laid as this one and exhibited same width of space, there would be much greater reason for charging the plaintiff, Keegan, with knowledge of the fact. There was, at least, a conflict of evidence as to the origin of the space into which Keegan fell, and as to its correspondence in character with other spaces due to planking between curved rails. There was evidence that the flange of the wheels required a space between the planks and the rail of $2\frac{1}{2}$ inches, and that the spaces thus left in the yard had never been blocked. The evidence as to the width of the space in which Keegan's foot was caught was conflicting. Some witnesses, who took no measurements, estimated it at 3 inches in width at the place of the accident. Others who did measure it, in one way or another, stated it to be $3\frac{1}{2}$ inches, while still others found it $3\frac{7}{8}$ and 4 inches. There was no measurement of spaces in other localities. Several servants of the company, testifying for it, stated that they had not noticed the width of this particular space until after Keegan was hurt. The section foreman, in charge of repairs and maintenance of track and roadbed in this yard, the witness who testified that all planks at curves were laid straight-edged, and not cut to correspond with curvature of the rail, said he had not known the width of this space until he examined it after the accident. Witnesses for the defendant in error testified that this plank was warped; some said it had "humped" in the middle. One or more said it was decayed and loose, the spikes having pulled out. In this conflicting state of the evidence, it would have been error to assume that the space in question was one of original construction, or was of the same character as the spaces in all other planks between curved rails. The jury might on the evidence infer that this was a wider space than usual, at other curves, and was the result of warping or decay, though the weight of evidence seems to be that the plank was sound and tightly spiked.

The evidence tended to show that this dangerous space had existed for not less than two months, and that during that time Keegan had been constantly employed in the part of the yard called the "Island Yard," and that his duties had called him to pass over or alongside of this defective roadbed many times each day for the preceding two or three months. But this "Island Yard" was about a mile in length, and contained 22 tracks, long and short, though the greater part of his

work was done on this defective roadbed. Keegan's duties were to couple for his crew. In this work he was called from one part of this yard to another. He rode as often as he walked, and when on the ground was there for the purpose of making a coupling, a duty which required active work and great attention. He says that he had not noticed this space. No one says he had. The circumstances of his employment were such that we cannot say that he was inexcusably ignorant of the dangerous character of this space.

That unblocked spaces existed between the rails and planked portions of the track was something so long existing and so general in this yard that he may well be held to have notice of that fact. But a space of 2½ inches was not an obvious danger. It was not a danger at all. A space of 3 inches was almost equally unlikely to be a source of danger. But a space of 4 inches was a trap into which most feet might fall. Whether this space was wide enough to be obviously dangerous to persons whose occupation required them to frequently pass it would depend much more upon the closeness with which it was observed and the accuracy of the eye in estimating its width. The actual test of measurement was in more than one instance a surprise to witnesses who estimated its width by the eye. This was notably the case with John White and W. W. Plummer, witnesses for the plaintiff in error. Others, notably witnesses for the defendant in error, had from mere testimony of the eye regarded it as a dangerous space. On a matter so easily determined as the relative height of the planking and top of the rail, there was a wide difference of statement. Witnesses on both sides said the plank at the point where Keegan was hurt was from one-half to one inch higher than the top of the rail. Others for the plaintiff in error said it was about an inch below the top of the rail. As the rail was shown to be four inches in thickness, and the planking not over three inches, and both spiked to the ties, it is clear that either these witnesses were bad judges of such slight differences, or that this particular plank had "humped," and was warped, as claimed for defendant in error. The circumstances clearly make a case in which the evidence is so in conflict upon matters of fact important in determining whether the existence of a dangerous space was so obvious as to make Keegan's ignorance inexcusable as to require its submission to a jury.

The case of Gleason v. Railroad Co., 159 Mass. 68, 34 N. E. 79, has many features in common with this case, and therefore has been much relied upon by plaintiff in error. But in that case there was no conflict as to the facts from which knowledge was to be presumed. The exception assumed the existence, at the time of Gleason's employment, of a space of three and one-half inches in the planking of a track in a yard over a waterway. This space was near a switch which was tended by Gleason in a yard only 500 feet long and 40 feet wide. On these admitted facts, Gleason was presumed to have accepted the risk. The case is possibly an extreme one. To reverse in this case would require us to go even beyond that ruling. On this record we could not justifiably assume the existence of this hole when Keegan accepted employment. Knowledge of the existence of such a hole in the roadway might be presumed as matter of law from employment in a yard 500

feet long and 40 feet wide, which would be unjustifiable in a yard a mile long and containing 22 tracks. Neither do we think that cases are controlling which turn upon the circumstances under which an employé will be held to have accepted the risk from unblocked frogs or switches. Questions of this kind must mainly turn upon the facts of a particular record. Before a court is authorized to presume, as matter of law, that an employé accepts the dangers incident to defective machinery or roadbed, it must appear that he accepted employment with actual knowledge of such defect and its dangers, or that he continued in the service after he acquired knowledge, or by due care and reasonable attention might have known of the danger. To justify a presumption of knowledge, the defect must be obvious and its danger equally plain to one at all attentive. The facts here do not make a case where the court could justifiably say that Keegan's ignorance of the dangerous character of this space in the roadbed was unjustifiable in law and his acceptance of the risk presumed.

Other matters have been presented by the assignment of errors. They have received attention. None of them are well taken. The judgment must be affirmed.