### JAMES B. CLOW & SONS v. BOLTZ.

(Circuit Court of Appeals, Sixth Circuit. March 7, 1899.)

#### No. 610.

1. MASTER AND SERVANT—DANGEROUS PLACE TO WORK—RECIPROCAL DUTIES.

An employé has a right to presume, when directed to work in a particular place, that reasonable care has been exercised by the employer to see that such place is safe, and is not negligent in relying on such presumption, unless a danger is obvious and should be known to a reasonably prudent employé; and for that reason the degree of care required of the employer is greater than that required of the employé, and the employer may be chargeable with negligence in failing to ascertain a danger, where the employé is not.

2. SAME—ACTION BY SERVANT FOR INJURIES—ASSUMPTION OF RISK.

Where the manner of using a machine with which an employé was required to work, and by which he was injured, appeared, in the light of facts disclosed after the injury, on the trial of an action by the employé for damages, to have been obviously dangerous, but the question of its safety had been called to the attention of the employer, who continued the use, and the machine had been so operated for some time without injury to any one, the question of whether the employé, who was a common laborer, had assumed the risk, was one for the jury.

In Error to the Circuit Court of the United States for the Eastern Division of the Northern District of Ohio.

This was a suit at law for damages for personal injury. The plaintiff was employed by the defendant, a corporation engaged in the manufacture of cast-iron pipe. The pipe is made by pouring the molten metal into a mold. The mold is made by sinking a hole deep into the ground, lining it properly, and then inserting in this hole a heavy core. The core is removable. It is

cylindrical in form, and hollow, with short projections or lugs at each end, upon which it is hung or steadied. The core is bound round with hay, which is, in turn, covered with mud, and baked in an oven. It has to be removed from the oven to the pit, and back again, at short periods of time. It is carried on a car running upon a railway track about 35 feet long. The injury to the plaintiff was occasioned by the falling of one of these cores from the car or truck, upon which it was being carried, onto the shoulders and back of the plaintiff. The cores vary in size according to the size pipe to be made. The core which fell in this instance was a core for a 24-inch pipe. The truck upon which the core was carried was made to carry two 36-inch cores and two 20-inch cores. The cores were about 14 feet in length. The truck was a rectangular iron frame, made of railroad iron, on four wheels. At each end was a framework or rack supporting the two 36-inch cores, and on this rack, and rising above it, were two standards, supporting the two 20-inch cores. The 36-inch cores were on the outside of the car, while the 20-inch were in between the two 36-inch cores, but above them. The racks were not pivoted to the cars, nor the standards to the racks. The legs of the racks straddled the frame of the cars, and the legs of the standards straddled the frame of the racks. The 20-inch cores on the standards were about 6 feet from the ground, and weighed 3,000 pounds each. The bases of the standards were broader than their tops, which had grooves, into which the axial lugs of the cores fitted somewhat loosely. The standards had been made to carry but 20-inch pipe. They seem to have been strong enough to carry 24-inch pipe, but when 36-inch pipe were put upon the same car, which was but four feet wide, it was found that the standards, if pushed close together, would not be far enough apart to carry the 24-inch cores without chafing the surface of one against that of the other. As the object of baking in the oven was to prevent this surface from abrading, it became necessary to prevent the two cores from rubbing together. Accordingly, with the knowledge and by the direction of the superintendent and managers of the defendant company's works, wedges were introduced under the inner side of each standard, so as to topple the standard out a little from the perpendicular line. In that way, by using wedges on both standards of sufficient thickness, it was possible to swing the 24-inch cores far enough away from each other not to rub. The cores were loaded onto and off the car by means of cranes, after they had been properly prepared with hay and mud. The car was pushed up an incline into the ovens, where the cores were baked. After they were sufficiently baked, the men operating the car, by means of hooks, pushed and pulled the car slowly down the slightly inclined track to the pit. It was the duty of one of the men to pull, and at the same time to carry a wedge to put under the front wheel of the car, to prevent its running into the pit. This duty was assigned to the plaintiff, John Boltz. He was a common laborer, who had worked in the foundry for six months. He was sometimes called the "first laborer" of the gang. His duties were to assist in loading and unloading the cores, in pushing them in and out of the oven, and in other common labor. The gang was in charge of the core maker, who was an expert in covering and baking the cores. The car had been used for six months, carrying cores for smaller-sized pipe, without any accident whatever. About eight days before the accident, however, heavy orders were received for 36-inch pipe; and, in order to obviate the difficulty of the use of these cores with the 24-inch cores on the same car, the wedges already spoken of were introduced, against the protest of the core maker, who said they were not safe. The core maker adjusted the wedges. The railway track consisted of two ordinary rails, 30 feet in length, supplemented by two rails 6 feet in length. At the joint of the long and short rail on the west side there was a depression in the ground, so that one rail sat higher than the other, and gave a jolt to the passing car. This defect was known to the plaintiff, but an attempt had been made to remedy it by putting an iron plate underneath the joint to hold the two ends level. The great weight of the evidence seems to show that this joint was not the cause of the accident, but it was not of such a character as to justify the court in taking that issue away from the jury. The learned trial judge delivered an elaborate charge, in which he made very clear distinctions between the lia-

bility of the defendant to the plaintiff for negligence in the discharge of the duties which the master owes to the servant, of furnishing reasonably safe appliances, tools, and machinery with which to work, and the nonliability of the master for injuries caused by the negligence of the fellow servants of him who is injured. He left the question to the jury to say whether the car, as constructed, with the wedges, was a machine which a reasonably prudent employer would furnish to his servants to be used in his business. He further charged the jury that if the dangerous character of the machine was so obvious that an ordinarily intelligent laborer of the class of laborers to which the plaintiff belonged must or should have observed its danger, and the plaintiff nevertheless continued in the employ of the master without complaint, he assumed the risk incident to such employment, and was guilty of contributory negligence, should injury occur. He left the question to the jury, for them to decide, as follows: "And these are the questions for you to decide: (1) Was the unfitness and unsafety of this truck and these appliances on this occasion, if you find them unfit, such a defect and danger as was known, or ought to have been known, to an ordinarily prudent and careful employer? (2) If you find that the employer was negligent in this regard, were the defects and danger of a character that an ordinarily intelligent employé should, under the circumstances, have known and realized them? If both these questions are answered in the affirmative, the plaintiff cannot recover. If the first be answered in the affirmative and the second in the negative, the plaintiff can recover. If both be answered in the negative, the plaintiff cannot recover, for then it would be one of those inevitable accidents for which nobody was responsible." There were other questions arising in the case, but they were of such minor importance that the court did not think it necessary to consider them.

Wilcox & Friend, for plaintiff in error. ·

J. F. Wilkin and James M. Williams, for defendant in error.

Before TAFT and LURTON, Circuit Judges, and SEVERENS, District Judge.

TAFT, Circuit Judge (after stating the facts as above). The law governing the reciprocal duties of employer and employé with reference to the safe condition of the place where the employé is to work, or of the machinery and tools with which he is to do his work, is well settled. It is the duty of the employer to exercise ordinary care to provide and maintain a reasonably safe place in which the employé is to perform his services, so that the employé shall not be exposed to unnecessary and unreasonable risks. The employé has the right to presume, when directed to work in a particular place, that reasonable care has been exercised by his employer to see that the place is free from danger, and, in reliance upon such presumption, may discharge his duties in such place, unless there are obvious dangers which would lead a reasonably prudent employé either to refuse to work in the place, or to make complaint of the same to his master. If, however, the danger is not actually known to the employé, or would not become known to an employé of reasonable prudence performing the duties imposed on him, he cannot be charged with contributory negligence in the happening of an injury to him by reason of the condition of the place in which he works. Norman v. Railroad·Co., 22 U. S. App. 505, 10 C. C. A. 617, and 62 Fed. 727. In the case last cited, we referred to the clear and comprehensive statement of the law by Judge Sanborn, speaking for the Eighth circuit, in the case of Railway Co. v. Jarvi, 10 U. S. App. 439, 448, 3 C. C. A. 436, and 53 Fed. 68. In that case the

plaintiff was a miner, who was injured by the falling of a large stone from the roof of a mine; and the question was whether the plaintiff had been reckless, in not knowing or discovering the dangerous condition of the roof from which the stone fell. The learned judge, speaking of the obligation of the servant, said:

"He cannot recklessly expose himself to a known danger, or to a danger which an ordinarily prudent and intelligent man would, in his situation, have apprehended, and then recover of the master for an injury which his own recklessness has caused. * * * But the degrees of care in the use of a place in which work is to be done, or in the use of other instrumentalities for its performance, required of the master and servant in a particular case, may be, and generally are, widely different. Each is required to exercise that degree of care in the performance of his duty which a reasonably prudent person would use under like circumstances; but the circumstances in which the master is placed are generally so widely different from those surrounding the servant, and the primary duty of using care to furnish a reasonably safe place for others is so much higher than the duty of the servant to use reasonable care to protect himself in a case where the primary duty of providing a safe place or safe machinery rests on the master, that a reasonably prudent person would ordinarily use a higher degree of care to keep the place of work reasonably safe, if placed in the position of the master who furnishes it, than if placed in that of the servant who occupies it."

The only point upon which we feel the slightest doubt in this case arises upon the motion which was made by the defendant, at the close of the plaintiff's evidence, to take the case away from the jury and direct a verdict for the defendant, on the ground that the plaintiff must have known the dangers incident to the use of the machine from the use of which the injury happened, and must therefore have assumed the risk. Now that the accident has happened, now that the measurements are given, now that the weight of the cores is accurately known, now that the narrow range of the point of equilibrium in the standards, with the use of the wedges, is clearly shown, it may be difficult to understand how any one with the slightest knowledge of mechanics could fail to appreciate the dangers arising from the use of this car with the cores adjusted as they were. But it must be borne in mind that the plaintiff was a common laborer, that the question of the safety of the machine had been brought to the attention of the superintendent and managers of the foundry, that the car had been operated for six months without injury, and that the plaintiff had a right to assume that his master would exercise due care in his behalf in keeping the machinery and appliances safe. In the light of these considerations, we cannot say that the question of plaintiff's negligence, or the question of the amount of risk which he assumed, was not a question for the jury. It was left to them, with the proper and discriminating statements of the law, and applications of the law to the facts. The jury found that the circumstances were such that he was not charged with the knowledge of the danger incident to the use of that machine. We do not think the course of the court, in leaving this issue open to be settled by the jury, was erroneous.

It is argued further that the plaintiff was guilty of negligence in running by the side of the car at the time of the injury,—a place from which he had been warned by his superior, it was said. The question whether he had been warned from this place, and whether

it was negligence in him to be there, and, indeed, whether it was not necessary, in the discharge of his duty, that he should be there, were all left to the jury by proper charges of the court. The judgment of the circuit court is affirmed.