KENNEY v. MEDDAUGH et al.

(Circuit Court of Appeals, Sixth Circuit. August 15, 1902.)

No. 1,022.

**1. LOCOMOTIVE FIREMAN—INJURY FROM MAIL CRANE—ASSUMPTION OF RISK.**
A locomotive fireman will be held to have assumed the risk from proximity to the track of a mail crane; he having been a fireman on the road for a year, during which there was no increase in the size of the engines, and having passed this place 83 times, and been over the other division 123 times, and the crane having been in position all that time, and at substantially the same distance from the track as the other cranes on both divisions; and this though it was dark, and blowing hard and snowing, these circumstances merely requiring extra caution on his part.

**2. SAME—PROVIDING SAFE PLACE TO WORK.**
A railroad company cannot be held to have failed to use due care to provide a locomotive fireman a reasonably safe place to work, by reason of a mail crane, when in position, being, at its nearest point, only 13½ inches from the side of the locomotive; this being the distance of the other cranes on this and other roads; the master car builder, who was familiar with the government regulations, and under whose supervision the catches on the mail cars were constructed, testifying that they could not be operated efficiently if placed at a greater distance; and there being no testimony of a competent witness to the contrary.

**3. SAME.**
A railroad company owes no duty to a locomotive fireman, familiar with the road, to place lights on mail cranes.

In Error to the Circuit Court of the United States for the Eastern District of Michigan.

This is an action to recover damages for the alleged wrongful death of Cornelius J. O'Brien. The lower court at the close of all the evidence, upon motion of defendants, directed a verdict for them. The judgment rendered thereon is complained of herein. The accident which resulted in O'Brien's death happened after dark on the evening of February 1, 1900, at Climax, a station on the Western division of defendants' railroad, extending from Battle Creek, Mich., to Chicago, Ill. It is the second station west of Battle Creek, and a short distance therefrom. At that time, decedent was fireman on defendants' fast passenger train from Battle Creek to Chicago, due to leave the former place at 3:40 p. m., but which in fact left at 5:57 p. m., being 2 hours and 17 minutes late, and reached Climax at 6:15 p. m. The depot at that station is on the south side of the track, or left-hand side as you go west. On the same side, and about 475 feet east of the depot, a mail crane was stationed, to hold mail pouches to be taken aboard of fast passenger trains not stopping there, by means of mail catchers attached to the mail cars. As decedent's train passed this mail crane that evening, he was struck in the forehead by the upper arm thereof, and rendered unconscious, and shortly thereafter he died. No one saw the collision, and it is only a matter of inference from circumstances that his death was due to this cause. But there can be no doubt as to this, and defendants in error do not contend that it was not. In addition to its being dark, there was testimony to the effect that it was snowing, though not to any great extent, and blowing hard. In front of the depot building, and about 11 or 12 feet from the track, was a signal board which indicated to each train as it passed the number of the train just ahead of it, and the time it passed the station, and above it a signal light,—red if there was danger, and white if the way

¶ 1. Assumption of risk incident to employment, see note to Railroad Co. v. Hennessey, 38 C. C. A. 314.

was clear. East of the mail crane, about the same distance that it was east of the depot, there were signal lights at two switches, probably on the north side of the track, or right-hand side as you go west. There was a rule of the company which required firemen on locomotives to be on the lookout for and to receive all the signals which might be given or located on the left side of the locomotive, and to transmit them promptly and correctly to the engineer. It was claimed by defendants that it was not necessary for a fireman. to look out of the window on the side of the cab in order to comply with this rule; that he could see the entire width of the right of way, and beyond it, by looking out of the window in front; by plaintiff, that this could not be done when the vision through the window was obstructed by accumulated snow; by defendants, that in such event the fireman could open and clean the window, and thus remove the obstruction to his sight; and by plaintiff, that this could not be done when the snow was continuous. There was, however, no evidence that vision from the window in front was obstructed by snow at the time of the accident. It was purely a matter of speculation as to whether it was. But there was evidence that it was more or less customary for firemen on defendants' railroad to look out of the side window, in watching for signals. It was proven, though, that in order for him to do so it was not necessary that he should put his head out more than four to six inches.

Decedent had been in the employ of defendants as a fireman for not quite a year before the accident. In that time he had worked upon both divisions of defendants' road,—the most of the time, however, on the Eastern division, from Battle Creek to Port Huron. He had made, in all, 206 runs. Of these, 123 were on the Eastern division, and 83 on the Western. He had worked on both freight and passenger trains. He had made 9 runs on passenger trains on the Eastern division, and 6 on the Western. During that time there were in use on defendants' railroad 16 large Baldwin engines,—8 on freight trains and 8 on passenger,—and others of a smaller type. There was no difference between those used on freight trains and those on passenger, save in this: that the cabs of the latter were 6 inches higher than the former. Of the nine runs which decedent had made on passenger trains on the Eastern division, eight were on the larger engines, and one on the smaller. Of the six runs which he had made on the Western division, four were on the larger engines, and two on the smaller. Of the runs on freight trains, about twice as many were made on the larger engines as the smaller, and in the six months preceding the accident they were almost entirely on the larger engines. The firemen, as well on passenger as on freight engines, had nothing to do in connection with the mail cranes along the road, and the opportunity of observing them and their proximity to the railroad track was as good on freight engines as on passenger. They were often up in position when freight trains passed or were on sidings waiting for passenger trains to pass. The distance between the outer end of the upper arm of the mail crane in question when in position and the outer edge of the nearest rail was 3 feet 6¼ inches, according to the testimony of defendants' employé who had charge of its mail cranes, and who measured the distance about the time of the accident. According to the testimony of a carpenter who had no connection with the railroad, introduced as a witness by plaintiff, the distance, at some time within the year after the accident, not more definitely located, was 3 feet 5½ inches. There were a number of mail cranes along the line of defendants' railroad. On the Eastern division there were about 19; on the Western division, between Battle Creek and Elsdon, a distance of 168 miles, there were 7 or 8. According to the standard prescribed by defendants for the use of those who construct them, the distance of mail cranes, measuring as above, should be 3 feet 6 inches. As to the bulk of those on defendants' road, the distance was 3 feet 6 inches, and above. As to one, it was as high as 3 feet 7¾ inches. As to two of them, it was under 3 feet 6 inches; the lowest being 3 feet 5½ inches. The distances on the Michigan Central Railroad run from 3 feet 5½ inches to 3 feet 7 inches. The distance between the side of the cab on the engine in which the decedent was acting as fireman at the time of the accident, and the outer end of the upper arm when in position, was 1 foot 1½ inches, or 13½ inches, with the other distance at 3 feet 5½ inches. Said

arm in position came a little above the center of the side window in the cab. According to the testimony of defendants' master car builder, who was familiar with the government regulations, and under whose supervision mail catchers were attached to the mail cars, the mail cranes on defendants' road could not be placed further away from the track and be used with the catcher. No one testified that they could be, and there was no fact proven from which an inference could be drawn that they could be. The carpenter, before referred to, who had seen the mail crane at Climax work, and examined it, was asked by plaintiff's attorney whether the mail crane could be put further away from the track, and still do the work of taking the mail as the trains went by; but, upon objection of defendants, the court refused to permit him to answer the question. This is the case upon which the lower court sustained defendants' motion to instruct the jury to find for defendants.

George Weadock, for plaintiff in error.

Harrison Geer, for defendants in error.

Before SEVERENS, Circuit Judge, and WANTY and COCHRAN, District Judges.

COCHRAN, District Judge, after stating the facts as above, delivered the opinion of the court.

It is urged as ground of reversal of the judgment of the lower court that it erred in giving the peremptory instruction. The grounds upon which it was requested by defendants were three: That, as a matter of law, defendants had not been guilty of negligence; that, likewise, decedent had assumed the risk of the proximity of the mail crane to the track; and that, likewise, if defendants had been guilty of negligence, decedent had been guilty of contributory negligence. The lower court, in giving that instruction, gave no intimation, so far as the record shows, as to the ground of its action. There was room for it to have been based on the last ground urged by the defendants. The distance from the side of the cab to the outer end of the upper arm of the mail crane, when in position to deliver the mail, the distance out of the cab window which a fireman would have to project his head to see signals, and decedent's knowledge of the existence of the mail crane at that station, and its proximity to the track, when in such position, here assumed, hereafter shown, tend to establish negligence on decedent's part, even though it may have been proper for him to look out of the window for that purpose at all. But it is unnecessary to decide whether this position was well taken or not, for we are clear that the defendants were entitled to the peremptory instruction upon the other two grounds urged.

The negligence which it was claimed by plaintiff the defendants had been guilty of, and which had caused decedent's death, was a failure to use due care to provide him a reasonably safe place in which to work. He claimed that the place in which the decedent was set to work was not reasonably safe, because of the too close proximity of the mail crane, when in position, to the track, and that, if defendants had used due care, it would not have been so. Even if this were true, the plaintiff was not entitled to recover, because the decedent had assumed the risk of that lack of safety. He had assumed it because he knew of it, and he knew of it because it was

obvious and he had had ample opportunity to observe it. It is a general rule in the law of master and servant that the latter assumes all the risks he runs whilst in the former's service by reason of the condition as to safety of the place in which, or the appliances with which, he is set to work, of which he has knowledge. It makes no difference whether the place or appliances are as safe as can be, reasonably safe, or not reasonably safe, provided he knows the lack of safety, whatever it is, and the risks he runs on account of it. It is likewise a general rule thereof that a servant is presumed to know any lack of safety that exists in the place in which, or the appliances with which, he is set to work, and the risk therefrom, which is obvious to one of his intelligence and experience, and which he has had an opportunity to observe. These two general rules have been applied or recognized by the supreme court of the United States, by this court, and by the supreme court of Michigan, within whose jurisdiction the accident happened.

In four distinct cases the supreme court held that, as a matter of law, no recovery could be had for injuries to a servant occasioned by the lack of safety of the place in which he was set to work, because, presumptively, he knew thereof and the risk due thereto, and had assumed that risk. They are the cases of Randall v. Railroad Co., 109 U. S. 478, 3 Sup. Ct. 322, 27 L. Ed. 1003; Tuttle v. Railroad Co., 122 U. S. 189, 7 Sup. Ct. 1166, 30 L. Ed. 1114; Kohn v. McNulta, 147 U. S. 238, 13 Sup. Ct. 298, 37 L. Ed. 150; Southern Pac. Co. v. Seley, 152 U. S. 145, 14 Sup. Ct. 530, 38 L. Ed. 391.

In the Randall and Tuttle Cases the servant injured was a brakeman, in the Kohn Case he was a switchman, and in the Seley Case he was a conductor acting as a brakeman. In all of the cases save the Kohn Case the lack of safety was in the track, or some connection thereof. In the Randall Case a ground switch was located in a space between two tracks six feet wide, and the brakeman, whilst unlocking it to allow his train to pass on one track, stationed himself near the other track, and was struck by an engine thereon. Concerning his knowledge of the lack of safety and risk, Mr. Justice Gray said:

"Although it was night, and the plaintiff had not been in this yard before, his lantern afforded the means of perceiving the arrangement of the switch and the position of the adjacent tracks."

Concerning his assumption of the risk, he said:

"A railroad yard, where trains are made up, necessarily has a great number of tracks and switches close to one another, and any one who enters the service of a railroad corporation in any work connected with the making up or moving of trains assumes the risk of that condition of things."

Though not pertinent here, it may not be out of place to quote, as bearing on decedent's conduct, Mr. Justice Gray's reference to the brakeman's choice of position in that case. He said:

"It could have been safely and efficiently worked by standing opposite the lock, midway between the tracks, using reasonable care; and it was unnecessary in order to work it to stand, as plaintiff did, at the end of the handle next the adjacent track."

In the Tuttle Case the brakeman was caught and crushed between two cars, on a siding containing a very sharp curve, which he was attempting to couple from the inner side of the curve. The coming together of the cars was due to the fact that the curve in the track caused their drawheads to pass each other, and not to meet. The coupling could have been made safely from the outer side of the curve. Concerning the brakeman's knowledge of the lack of safety and risk, Mr. Justice Bradley said:

"Everything was open and visible, and the deceased had only to use his senses and his faculties to avoid the dangers to which he was exposed. One of these dangers was that of the drawbars slipping and passing each other when the cars were brought together. It was his duty to look out for this and avoid it. The danger existed only from the inside of the curve. This must have been known to him. It will be presumed that, as an experienced brakeman, he did know it; for it is one of those things which happen in the course of his employment under such conditions as existed here."

Concerning his assumption of the risk, he said:

"Tuttle, the deceased, entered into the employment of the defendant, as a brakeman in the yard in question, with a full knowledge (actual or presumed) of all these things,—the form of the side tracks, the construction of the cars, and the hazards incident to the service. Of one of those hazards he was unfortunately the victim. The only conclusion to be reached from these undoubted facts is that he assumed the risks of the business, and his representative has no recourse for damages against the company."

In the Seley Case the conductor, whilst attempting to make a coupling, caught his foot in an unblocked frog, and was run over and killed. Concerning his knowledge of the lack of safety and risk, because of which it was held that he had assumed the risk, Mr. Justice Shiras said:

"The evidence showed that Seley had been in the employ of the defendant for several years as brakeman and as conductor of freight trains; that his duty brought him frequently into the yard in question to make up his train; that he necessarily knew of the forms of frogs there in use; and it is not shown that he ever complained to his employers of the character of frogs used by them. He must therefore be assumed to have entered and continued in the employ of the defendant with the full knowledge of the dangers asserted to arise out of the use of unblocked frogs."

In the Kohn Case the lack of safety was in freight cars by which the switchman was injured whilst attempting to couple them. It consisted in their having double deadwoods, or bumpers of unusual length, to protect the drawbars. By far the larger number of cars which passed through that yard had none of these deadwoods or bumpers, but the switchman had in fact seen and coupled cars like those that caused the accident, and that more than once. Concerning his knowledge of the lack of safety and risk, and assumption of the risk, Mr. Justice Brewer said:

"But all this was obvious to even a passing glance, and the risk which there was in coupling such cars was apparent. It required no special skill or knowledge to detect it. The intervener was no boy placed by the employer in a position of undisclosed danger, but a mature man doing the ordinary work which he had engaged to do, and whose risks in this respect were obvious to any one. Under those circumstances, he assumed the risk of such an accident as this, and no negligence can be imputed to the employer."

In each one of these four cases, though there was lack of safety in the particulars pointed out, the places in which the servants were at work when injured were reasonably safe, or there was evidence to that effect. In the Randall Case, Mr. Justice Gray said:

"The switch was of a form in common use, and was, to say the least, quite as fit for its place and purpose as an upright switch would have been."

In the Tuttle Case, Mr. Justice Bradley said:

"Although it appears that the curve was a very sharp one at the place where the accident happened, yet we do not think that public policy requires the courts to lay down any rule of law to restrict a railroad company as to the curves it shall use in its freight depots and yards, where the safety of passengers and the public is not involved,—much less, that it should be left to the varying and uncertain opinions of juries to determine such an engineering question. * * * The interest of railroad companies themselves is so strongly in favor of easy curves, as a means of facilitating the movement of their cars, that it may well be left to the discretion of their officers and engineers in what manner to construct them for the proper transaction of their business in yards, etc. It must be a very extraordinary case, indeed, in which their discretion in this matter should be interfered with, in determining their obligations to their employés."

In the Kohn Case, Mr. Justice Brewer said:

"It is not pretended that these cars were out of repair or in a defective condition, but simply that they were constructed differently from the Wabash cars, in that they had double deadwoods, or bumpers of unusual length, to protect the drawbars."

And in the Seley Case, Mr. Justice Shiras said:

"In this disputable state of the facts, the defendant asked the court to charge the jury as follows: 'The jury are instructed that if they find from the evidence that the railroad companies used both blocked and the unblocked frog, and that it is questionable which is the safest or most suitable for the business of the roads, then the use of the unblocked frog is not negligence, and the jury are instructed not to impute the same as negligence to the defendant, and they should find for the defendant.' This prayer should have been given by the court."

In three cases the supreme court refused to hold that, as a matter of law, the injured servant had assumed the risk due to lack of safety in the appliances with which or places in which he had been set to work, and held that it was for the jury to determine that question. They are the cases of Hough v. Railroad Co., 100 U. S. 213, 25 L. Ed. 612; Railroad Co. v. McDade, 135 U. S. 554, 10 Sup. Ct. 1044, 34 L. Ed. 235; Railroad Co. v. Archibald, 170 U. S. 670, 18 Sup. Ct. 777, 42 L. Ed. 1188. In these cases the appliances or places in question were not reasonably safe. In the Hough Case the court so acted because there had been a promise to repair. In the McDade and Archibald Cases it did so because the knowledge by the servant of the lack of safety and the risks arising therefrom was a disputable fact in the case. In the McDade Case a blacksmith was injured whilst attempting to put a belt on a moving pulley. Mr. Justice Lamar said:

"Upon every question in the case—the safety and unsafety of the machinery, the ignorance on the part of the plaintiff of the danger of it, and the negligence of the plaintiff at the time of the accident—the evidence is controverted."

In the Archibald Case a switchman, in order to uncouple cars by removing the coupling pin which held them together, was compelled to go between them,—the lever by which it could have been removed without going between being out of order,—and, whilst so attempting to remove it, his feet were caught by a broken brake rod, with links of chain attached to it, and a hook at its end, which was hanging down under one of the cars, and, in the movement of them, was projected out into the space between; and, in attempting to escape being thrown down, his right arm was caught between the drawhead and crushed. In all three cases, however, the correctness of said two rules were presupposed or recognized. In the McDade Case, Mr. Justice Lamar said:

"If the employer fails in this duty of precaution and care, he is responsible for any injury which may happen through a defect of machinery which was or ought to have been known to him, and was unknown to the employé or servant. But if the employé knew of the defect in the machinery from which the injury happened, and yet remained in the service and continued to use the machinery without giving any notice thereof to the employer, he must have been deemed to have assumed the risk of all danger reasonably to be apprehended from such use, and is entitled to no recovery."

In the Archibald Case, Mr. Justice White said:

"Where an employé receives for use a defective appliance and with knowledge of the defect continues to use it without notice to the employer, he cannot recover for an injury resulting from the defective appliance thus voluntarily and negligently used."

And again:

"Where an appliance is furnished an employé, in which there exists a defect known to him or plainly observable, he cannot recover for an injury caused by such defective appliance, if, with the knowledge above stated, he negligently continues to use it."

This court has likewise applied and recognized these two rules in cases that have come before it. In one case only has it had occasion to decide, as a matter of law, that the servant knew of and had assumed the risk. This it did in the case of Crude Oil Co. v. Grable, 36 C. C. A. 94, 94 Fed. 73. There an engineer of a stationary engine had been injured by contact between projecting bolts on the rim of a revolving wheel and an adjacent water-pipe line. Judge Clark said:

"Notwithstanding the general rule requiring the master to furnish a safe working place and safe instrumentalities, the servant, in addition to the ordinary perils incident to the business, assumes the risks arising from obvious, patent defects in the things which he uses, and which are known or should be known to him."

And again, in referring to the case in hand, he said:

"The position of the water pipe and the revolving wheel being visible and patent, such danger as existed on account of this situation was just as obvious to and as easily comprehended by the servant as the master. The duties of the servant brought him in daily contact with the machinery, and furnished him constant opportunity to inspect the same. His means of knowledge were evidently superior to those of the master. Notwithstanding that the defect was open, patent, and constant, and the servant's knowledge not only equal, but superior, to that of the master, defendant in error is forced into the dilemma of maintaining that the danger of such a defect was one

which the master was bound to anticipate, while the servant was not. This contention is evidently unsound, as will be recognized by its simple statement, without more. The servant was a mature man and a skilled engineer, whose duty brought the patent conditions and dangers constantly under his notice and during a long service. Under such circumstances, if the servant is not bound to anticipate and appreciate the danger, no grounds can be suggested on which the master is required to do so. If the knowledge and means of knowledge of the servant in respect to a patent defect are equal or superior to those of the master, there can be no recovery,—certainly so in the ordinary case."

In the case of Railroad Co. v. Hennessey, 38 C. C. A. 307, 96 Fed. 713, this court held that a servant had, as a matter of law, assumed the risk arising from a lack of safety in that with which he had to do in the course of his employment, though he was ignorant of the particular lack of safety through which he was injured. This was because it was a part of his employment to handle that which was in an unsafe condition. In the case of Narramore v. Railroad Co., 37 C. C. A. 499, 96 Fed. 298, 48 L. R. A. 68, it held that the servant had not and could not have assumed, as a matter of law, the risk through which he was injured, because the lack of safety out of which it arose, to wit, an unblocked guard rail, was in violation of statute. It was recognized, however, that if it had not been for the statute it would have to be held, as a matter of law, that the risk had been assumed, because of the servant's presumptive knowledge of the risk, and this notwithstanding the fact that he had testified that he had had no knowledge thereof. Judge Taft said:

"In the absence of the statute, and upon common-law principles, we have no doubt that in this case the plaintiff would be held to have assumed the risk of the absence of the blocks in the guard rails and switches of the defendant. His denial of knowledge of the fact that the rails and switches of plaintiff generally were unblocked is entirely immaterial. Nor is his vague statement that he was so busy as not to notice whether the rails and switches of plaintiff generally were unblocked in a yard where there were hundreds of guard rails and switches, and in which he was constantly at work for seven months, of more significance or weight. His evidence upon this point is not creditable to him. He could only have been ignorant of the admitted policy of the defendant in respect to blocks through the grossest failure of duty on his part in a matter that much concerned his personal safety and the proper operation of the road. In such a case the authorities leave no doubt that the servant assumes the risk of the absence of the blocks."

In a number of cases this court has refused to hold, as a matter of law, that the servant had assumed the risk through which he was injured. This it did in these cases: Norman v. Railroad Co., 10 C. C. A. 617, 62 Fed. 727; Railroad Co. v. Thompson, 27 C. C. A. 333, 82 Fed. 720; Railway Co. v. Keegan, 31 C. C. A. 255, 87 Fed. 849; Clow & Sons v. Boltz, 34 C. C. A. 550, 92 Fed. 572; Railroad Co. v. Yockey, 43 C. C. A. 228, 103 Fed. 265; Railroad Co. v. Miller, 43 C. C. A. 436, 104 Fed. 124; Felton v. Girardy, 43 C. C. A. 439, 104 Fed. 127; Railroad Co. v. McDade, 50 C. C. A. 591, 112 Fed. 888.

In the Norman, Keegan, and Boltz Cases, it refused to so hold because knowledge of the risk was a disputable fact, its obviousness and the opportunity of observing it not being such that it was to be presumed; in the Thompson Case, because, whether the injury was

due to the risk assumed was disputable; in the Yockey Case, because the question as to whether the servant had had a reasonable opportunity to quit after becoming aware of the risk was disputable; and in the Miller and Girardy Cases, because knowledge of the risk, on account of the lack of experience of the servants who were injured through it, was a disputable fact. Of all the cases in which this court refused to so hold, probably the McDade Case needs most to be distinguished from the one in hand. This is because the railway servant in that case had been injured by a structure alongside the track. He was a brakeman, and whilst on the top of a car, signaling to the engineer with his lantern over the side thereof, he was struck by a waterspout projecting unnecessarily close to passing cars. Though an experienced brakeman, he had been on the road in question but a short time. He had been over the division where the waterspout was located not more than eight or ten times, equally divided between day and night trips. This was the only waterspout which it was shown projected so close to passing cars, and the car upon which the brakeman was located when struck was a furniture car, which was higher and wider than the average freight car. Judge Lurton said:

"McDade was entitled to rely upon the company's having properly constructed this spout, and the danger from the proximity of this particular spout was by no means so obvious, especially in view of McDade's short experience on this part of the road, as to charge him with having assumed the risk."

These cases all recognize, however, that, as a general rule, a servant assumes the risks of which he has knowledge, and that he is presumed to know the risks that are obvious and that he has had an opportunity to observe.

These principles have been recognized and applied by the supreme court of Michigan, within whose jurisdiction the accident in question happened, in these cases: Illick v. Railroad Co., 67 Mich. 632, 35 N. W. 708; Pennington v. Railway Co., 90 Mich. 505, 51 N. W. 634; Ragon v. Railway Co., 97 Mich. 265, 56 N. W. 612, 37 Am. St. Rep. 336; Manning v. Railway Co., 105 Mich. 260, 63 N. W. 312; Phelps v. Railway Co., 122 Mich. 171, 81 N. W. 101, 84 N. W. 66; Potter v. Railway Co., 122 Mich. 179, 81 N. W. 80, 82 N. W. 245; Pahlan v. Railway Co., 122 Mich. 232, 81 N. W. 103.

The exemption of a master from liability for injuries to a servant occasioned by the lack of safety in his working place or appliances, on the ground that the servant has assumed the risk thereof, does not come within the principle of those cases which hold certain contracts void, as against public policy, which provide for exemption from liability for injuries due to negligence. Railroad Co. v. Voight, 176 U. S. 505, 20 Sup. Ct. 385, 44 L. Ed. 560.

Such, then, being the settled law in regard to the assumption by a servant of the risks of his employment of which he knows, and as to his presumptive knowledge thereof, it follows that if the proximity to the track of the mail crane in question, when in position, and the risk of coming in contact with it and being injured, were obvious to one of decedent's intelligence and experience, and he had

had an opportunity to become aware of them, it should be presumed that he did know of them, and should be held that he had assumed the risk.

The decedent was 32 years of age. The evidence is not definite as to the extent of his railroad experience. He had been a fireman on defendants' road for not quite a year. According to the testimony of his widow, he had acted as a fireman in the yard at Durand, doing some extra running, for seven or eight months, which was probably immediately preceding his going upon the road. There is no evidence of his having had any previous railroading experience. During all the time he was on the road, the mail crane in question had been located at Climax, the same distance from the track. He had passed there 83 times, in all, on both freight and passenger trains,—mostly on freight; but the opportunity of observation as to the proximity of the mail crane was practically as good on freight as on passenger trains, some, if not many, of which trips, no doubt, were in the nighttime. The mail crane in question was one of a number of other mail cranes on the same division, and on the other division over which he had made 123 like runs, and they all were substantially of the same proximity to the track as this one. In that time there had been no increase in the size of the engines. There can therefore be no doubt that the proximity of the mail crane in question to the track, and the risk of coming in contact therewith and suffering harm therefrom, were perfectly obvious to decedent, and that he had had ample opportunity to observe them. It must be held, therefore, that he knew of that risk and assumed it. It is probable that he did not know the exact distance between the side of the cab and the outer end of the upper arm of the mail crane when in position, but he knew that it was sufficiently close to be dangerous if he put his head out too far. It is true, also, that it was dark and blowing hard, and, to some extent, snowing. Had he never been over the road before, or but a few times, these circumstances might have been pertinent, as bearing upon the question as to whether he knew of the proximity of the mail crane to the track, and the risk thereof; but where, as here, previous knowledge thereof is clearly shown, the sole effect of these circumstances was to render it incumbent on decedent to use extra precaution to prevent injury therefrom. He knew that he was on a fast passenger train, and that the mail cranes along the road would be up in position to deliver their mail to it, and, with this knowledge, he should not have placed his head so as to come in contact with them. No fact or circumstance was proven in the case that rendered it necessary that he should have put his head out so far as to be struck by it.

But the defendants were entitled to the peremptory instruction not only on the ground of assumed risk, but also on the ground that the defendants had not been guilty of negligence toward him. This follows from the fact that decedent had assumed the risk of the proximity of the mail crane to the track. The master owes no duty to a servant to remove a risk that he has assumed, and hence is not negligent towards him in failing to remove it. Saying that a servant has assumed a risk is but another way of putting it that the

master has not been negligent in not removing the risk. Valentine, J., in the case of Rush v. Railway Co., 36 Kan. 129, 12 Pac. 582, said:

"Culpable negligence on the part of one person as towards another always involves a breach of duty on the part of the former as towards the latter. Where there is no breach of duty, there can be no culpable negligence, and it is only for negligence of a culpable character that any person can be held responsible in law. Where an employé is hired and paid for assuming a known danger, and the thing itself is not contrary to law, it cannot be properly said that the hirer has been guilty of any breach of duty as towards the person hired, and therefore it cannot be said that the hirer has been guilty of any culpable negligence as towards the person hired."

In the Narramore Case, supra, Judge Taft said:

"Assumption of risk is a term of the contract of employment, express or implied from the circumstances of the employment, by which the servant agrees that dangers of injury obviously incident to the discharge of the servant's duty shall be at the servant's risk. In such cases the acquiescence of the servant in the conduct of the master does not defeat a right of action on the ground that the servant causes or contributes to cause the injury to himself; but the correct statement is that no right of action arises in favor of the servant at all, for, under the terms of the employment, the master violates no legal duty to the servant in failing to protect him from dangers, the risk of which he agreed, expressly or impliedly, to assume. The master is not, therefore, guilty of actionable negligence towards the servant. This is the most reasonable explanation of the doctrine of assumption of risk."

And in the Kohn Case, supra, Mr. Justice Brewer said:

"Under those circumstances he assumed the risk of such an accident as this, and no negligence can be imputed to the employer."

There was, however, no failure on the part of the defendants to use due care to provide the decedent a reasonably safe place to work, in this particular. Notwithstanding the proximity of the mail crane to the track, and the liability of a negligent fireman coming in contact with it when in position, it was reasonably safe. According to the testimony of defendants' master car builder, who was familiar with the government regulations in such matters, and under whose supervision the catchers were constructed upon the mail cars, and who was therefore an expert in such matters, the mail cranes could not be placed at a greater distance and operated efficiently. The place in which decedent was set to work was, then, according to this opinion, as safe as it could be made, consistently with provision being made for fast passenger trains taking up the mail at small stations without having to stop to do so. In addition to this, all other mail cranes on defendants' road and those upon the Michigan Central and Pere Marquette Railroads were located at substantially the same distance from the track as the one in question. There was no testimony to the contrary of this. The carpenter at Climax, who had seen the mail crane in question work, and examined it, was asked by plaintiff, in substance, whether it could have been placed farther away from the track, and still do the work of delivering the mails to the trains as they passed by. But upon objection by defendants, the court refused to permit the question to be answered. This ruling was excepted to, and has been assigned as error. It does not appear from the record what answer the witness would have made to the question if he had been permitted to answer. And even if it did ap-

pear that he would have answered it in the affirmative, we think the court's ruling was correct. It was not shown that he had sufficient knowledge in regard to the matter to be entitled to give an opinion as to it. Such knowledge as he had was confined to the mail crane. It was not shown that he had any knowledge in regard to the mail catcher and its workings, except, perhaps, to see it catch the mail as the train passed by. Besides, if admitted, it would have been entitled to no weight whatever as against the action of the defendants and the Michigan Central and Pere Marquette Railroad Companies as to all the mail cranes located on their roads. In the Randall Case, supra, plaintiff and another brakeman had testified that the switch which the plaintiff was attempting to unlock when injured was not properly constructed and arranged, and that it should have been an upright switch, instead of a ground one. Concerning this testimony, Mr. Justice Gray said:

"There was no sufficient evidence of any negligence on the part of the railroad company in the construction and arrangement of the switch to warrant a verdict for the plaintiff on that ground. The testimony of the plaintiff and his witness was too slight."

In the Tuttle Case, Mr. Justice Bradley said:

"The interest of railroad companies themselves is so strongly in favor of easy curves, as a means of facilitating the movement of their cars, that it may well be left to the discretion of their officers and engineers in what manner to construct them for the proper transaction of their business in yards, etc. It must be a very extraordinary case, indeed, in which their discretion in this matter should be interfered with, in determining their obligations to their employés."

And in the McDade Case, in this court, Judge Lurton said:

"If it had appeared that there was a uniform custom on well-managed railroads to construct such swinging waterspouts in such proximity to passing cars as to endanger employés standing or sitting on the roofs of such cars while in the discharge of their duty, no legal imputation of negligence would, perhaps, arise from such a construction, however unnecessary such dangerous proximity might be."

Still further, as we have shown and the above quotation indicates, it was an immaterial question in the case whether the mail crane could have been placed farther back from the track, and the mail delivered efficiently. The decedent knew its actual proximity to the track, and assumed the risk thereof. In view of all these considerations, it must be held that the ruling of the court was correct. At any rate, it cannot be said that it was clearly erroneous. In the case of Manufacturing Co. v. Phelps, 130 U. S. 520, 9 Sup. Ct. 601, 32 L. Ed. 1035, Mr. Justice Gray said:

"Whether a witness called to testify to any matter of opinion has such qualifications and knowledge as to make his testimony admissible is a preliminary question for the judge presiding at the trial, and his decision of it is conclusive, unless clearly shown to be erroneous in matter of law."

It must be held, therefore, that there was no failure on defendants' part to use due care to place the mail crane in question at a reasonably safe distance from the track.

It was proven that the mail crane was not lighted, and the point is made that defendants were negligent in not causing it to be lighted.

We have heretofore directed attention to the sole significance of the fact that the night was dark, and it was perhaps snowing to some extent. As to the claim that the mail crane should have been lighted, the defendants had a right to act upon the idea that decedent, being aware of the proximity of the mail crane to the track, would conduct himself in such a way as not to come in contact with it. In the case of Brown v. Railroad Co., 69 Iowa, 161, 28 N. W. 487, a fireman had been killed by coming in contact with a snow bank close to the railroad, and one of the particulars in which it was claimed that the defendant company had been negligent was in failing to place danger signals upon the snow bank. Rothrock, J., said:

"He knew of the existence of the banks of snow in close proximity to the track, and with this knowledge, as we held on the former appeal, he assumed the risk of the danger attendant upon the condition of the road in this condition. He must be held to have the same knowledge of this danger as he had of the close proximity of cattle chutes, coal sheds, platforms, bridges, water pipes, or other structures and appliances necessarily located in close proximity to the track, which may be passed in perfect safety so long as employés keep themselves within line of the cars in the train, but which are dangerous when an employé exposes himself to contact with them by swinging outside of the line of the train. And there is no rule of diligence which requires railroad companies to place signals at snow banks by flags in daylight and lanterns at night, to protect trainmen from injury, that would not also require them to do so at other objects near the track."

Our conclusion, therefore, is that there was no failure on the part of the defendants to use due care to provide the decedent a reasonably safe working place, and that on this ground, as well as upon the ground that decedent had assumed the risk of such lack of safety as there was in that place, the defendants had been guilty of no negligence towards the decedent, and because of this were entitled to the peremptory instruction given.

Three cases have been cited to us, involving injuries to railroad employés by mail cranes located alongside the railroad tracks. They are the cases of Railroad Co. v. Gregory, 58 Ill. 272; Sisco v. Railway Co., 145 N. Y. 296, 39 N. E. 958; Railroad Co. v. Milliken's Adm'x (Ky.) 51 S. W. 796. The question of assumption of risk does not seem to have figured in either one of them. The sole question in each one seems to have been as to the railway company's negligence. The Sisco Case is in accord with the position we have taken on that question, and the Gregory and Milliken Cases are not contra.

In the Sisco Case a brakeman, whilst climbing up the side of a car, was struck by the upper arm of a mail crane which was stationary, and the distance from the outer end of which and the side of the car was 12 inches. The defendants' evidence showed that cranes of similar construction were in use on many other railroads. There was no evidence that the crane, if placed further from the track, would have performed its work. The mail crane had been erected only a short time before the injury. It was held that the plaintiff was not entitled to recover, because there was no evidence of failure to use due care on defendants' part. Andrews, C. J., said:

"The employer does not undertake with the employé that he will use the very best appliances; nor is he called upon to discard machinery adopted by him in his business, reasonably suited therefor, although there may be other

machinery that may be safer. It is bound to the exercise of reasonable care in providing machinery and appliances, in view of all the circumstances. Still less is the master to be cast in damages for error of judgment in selecting one method of prosecuting his business, or one kind of machinery or appliance, on proof that another method or appliance is better or safer, when both methods or both kinds of appliances are in common use. Frace v. Railroad Co., 143 N. Y. 182, 38 N. E. 102; Flinn v. Railroad Co., 142 N. Y. 11, 36 N. E. 1046. It was not found, nor was there any evidence upon which a jury could infer, that the crane in question could be placed any further from the track than it was, and perform the function for which it was designed. Plaintiff was bound to show a state of facts indicating negligent construction or location, to raise a question for the jury upon this point. It was not sufficient for him to show an injury, or that operating the device involved danger to the brakeman. He took the risk of all constructions necessary and reasonably adapted to the business of the railroad. The burden was upon him to show that the appliance, concededly useful in the business of the defendant, was improperly constructed or located, and this he wholly failed to do. Proof that it was dangerous was not enough. He was bound to go further, and show that the defendant might, by the use of reasonable care, have accomplished its purpose, and at the same time protected its employés from the danger."

In the Gregory and Milliken Cases it was held that the questions of negligence and contributory negligence were for the jury. Judge Scott, in the former case, thus summarized the facts thereof:

"It most satisfactorily appears that in general those inventions for the delivery of the mails are not dangerous to the operations of the road. They have been and can be placed at a distance from the track that would be entirely safe, and still perform their proper functions. If such was not the case, it would be the duty of the company to abandon their use. There is evidence tending to show that the one at Cliola station was ·dangerous; that it had produced one or more injuries; and there is also evidence tending to show that the company had knowledge of that fact in ample time to have removed it to a safe distance, so as to have prevented the death of Burnett. The significant fact appears, and no reasoning, however ingenious, can destroy its force, that after its removal for only a distance of a few inches it was and has been perfectly safe, and no accident has since occurred from its use."

The employé injured in that case was a fireman, and the distance between the end of the arm and the side of the coaches was 7 to 10 inches, varyi g according to the construction of the different coaches. In making this quotation, we would not be understood as approving the statement therein that, if such useful instrumentalities as mail cranes could not be placed at a distance that was entirely or perfectly safe, they should be abandoned.

In the Milliken Case a brakeman who was sitting on the top of a freight car, with his feet hanging over the side, was knocked off and killed. This extract from the opinion by Judge Hobson is sufficient to differentiate that case from this, to wit:

"There was evidence that the crane was not upright, but leaned towards the road about four inches. The swing of the arms and the hanging of the bag, always on the side next to the road, would have a tendency to pull the upright post over. This would throw the bag nearer the car, the greater the inclination became. It was in proof that this crane was set some four and one-half inches nearer the track than the other cranes from which the mail was taken. If this proof was true, this mail bag hung something like eight inches nearer the track than required by the government; and if it had hung eight inches further off, from the photographs exhibited, it would seem that the intestate would not have been knocked off. We cannot say that the de-

fendant might, by the use of reasonable care, have accomplished its purpose, and at the same time protected its employés from the injury."

The Sisco Case was cited, approved, and distinguished.

The judgment of the court must be affirmed.