PAHLAN *v.* DETROIT, GRAND HAVEN & MILWAUKEE RAILWAY CO.

1. RAILROAD COMPANIES—DUTY TO EMPLOYÉS—SAFE PLACE.
   The requirement that employers shall furnish their employés with a reasonably safe place in which to work applies to its full extent to railroad companies.

2. SAME—COAL-BIN NEAR SIDING—JUDICIAL NOTICE.
   Where the undisputed evidence shows that the place furnished by a railroad company to its employés conforms to the general condition upon other roads, the court may say, as a matter of law, that the company has performed its duty in this respect; and the court may properly so instruct the jury

where the alleged defect is the maintenance of a coal-bin in close proximity to a siding, it being able to take judicial notice that those structures are commonly so placed.

3. SAME—ASSUMPTION OF RISK.

An employé of a railroad company, who, after dark, assisted in moving a detached way-car along a siding by pushing against a hand-rail on the front platform while he walked beside the car, assumed the risk of being injured by running against a coal-bin built close to the siding.

4. SAME—CONTRIBUTORY NEGLIGENCE—FAILURE TO SEE OBSTRUCTION.

An employé of a railroad company, who, on a dark night, assisted in moving a detached way-car along a siding by pushing against a hand-rail on the front platform while he walked beside the car, was guilty of contributory negligence in running against a coal-bin built close to the siding, where he might have seen the obstruction, had he looked out for it, at a distance of 10 feet.

Error to Ionia; Davis, J.   Submitted October 6, 1899. Decided December 12, 1899.

Case by Edward Pahlan against the Detroit, Grand Haven & Milwaukee Railway Company for personal injuries.   From a judgment for plaintiff, defendant brings error.   Reversed.

*E. W. Meddaugh* ( *Geer & Williams*, of counsel ), for appellant.

*John Nichol* and *James Curry, Jr.* ( *Allen B. Morse*, of counsel ), for appellee.

HOOKER, J.   At Ovid station the defendant's railroad consists of three tracks, there being two sidings north of the main track.   Upon the north side of the northernmost track there was a coal-bin, which was erected, some years before the occurrence giving rise to this action, by the Ovid Buggy Company, to receive coal shipped over the defendant's road.   At the time of the accident, the side of the bin next the track overhung 8 inches at a height of

6 feet, according to the testimony of one of the plaintiff's witnesses, who said that he measured it. He testified that the distance between the top of the posts and a coal-car was about 8 inches, and between the post and the bottom of the car about 18 inches, and at the west end was about 1 inch nearer the rail than at the other end. He also testified that he measured six way-cars, four of which were of the width of the coal-car, and two were about 4 inches wider. He also testified that the bin was not too near the track for convenience in unloading coal. It was erected and maintained by the buggy company upon lands of the defendant, by its consent; and there was a dispute as to the cause of the overhang,— one side alleging that it was built so, and the other that it had spread. The plaintiff had been in defendant's employ as a section hand for about a year and a half, and had worked upon the gravel train for about a week, prior to the accident. He had been through Ovid upon the train with two loads of gravel, but was otherwise unacquainted with the yard. Upon the day in question, a load of gravel had been taken east of Ovid, and after it was unloaded the train returned to Ovid, where it was to remain for the night. On reaching Ovid, the gravel train entered upon the middle track (*i. e.*, the main siding), and the way-car was cut off; and, with a view to getting it ahead of the engine, orders were given to push it upon the north siding, and the plaintiff, with others, did so. This was after dark, and, as plaintiff was walking beside and pushing the car by the hand-rail at the front platform, he claims to have struck his shoulder against the coal-bin, and suffered an injury. The train was in charge of a conductor named Judd, and the workmen were at the time under a foreman named Grimes; the assistant road-master having left the train at another station. Some witnesses say the order was given by Grimes; and others, that Judd gave it. There was another man in front of the plaintiff, pushing the car, but his identity was not ascertained. Nothing indicates that he was injured. The negligence complained of was the

maintenance of the coal-bin so close to the track, in viola-
tion of defendant's duty to furnish a safe place for plaintiff
to work.   It was also urged that the work was performed
under the direction of Grimes, who was a superior officer,
and that in giving the order he represented the master.

It is definitely settled in this State that the master owes
to the employé the duty of furnishing a reasonably safe
place to work, and that this rule applies to railroads as
well as other places.   The authorities are collected in the
cases of *Balhoff* v. *Railroad Co.*, 106 Mich. 613, and
*Anderson* v. *Railroad Co.*, 107 Mich. 595.   It is urged
that a railroad company has a right to construct its road
and structures after plans of its own, and not subject to
the approval of juries, who cannot be allowed to determine
such questions.   This is equivalent to saying that the
doctrine that a master must furnish a reasonably safe
place for his employé to work does not apply to railroads.
We appreciate the practical consequences of leaving such
a question to a jury, and the proneness of such tribunals
to accept the fact of an accident as sufficient evidence of
fault upon the part of the master.   We should hardly like
to admit that lawyers and juries know more about proper
railroad building than those experienced therein.   But, on
the other hand, we cannot say that railroads are free from
defects, or the owners and their employés from negligence;
nor is there authority or reason for exempting them from
the general law pertaining to master and servant.   Many
of the cases cited were railroad cases, and we repeat that
the question is settled for Michigan; and, wherever the
fact is fairly in dispute, we see no way for railroads to
avoid the submission of the question to a jury.   There are
cases, however, when no dispute arises; *e. g.*, when the
undisputed evidence shows that the place furnished by the
master conforms to the general condition upon other
roads, or where the defect is a known or obvious one to
the employé, or one of which he is bound to take notice.
In the former the court may say, as a matter of law, that
there is no negligence; in the latter, as well as the former,

that the employé has assumed the risk obviously incident to the conditions, whether defective or not.

It is a well-known fact, of which we may take judicial notice, that it is usual for sidings to be so constructed as to permit cars to stand close to buildings, thereby facilitating the loading and unloading, and reducing the cost and danger of the operation. This is uniformly true of elevators and coal-bins, and every person of common intelligence may reasonably be presumed to know that the siding is made for such purposes, to which, perhaps, a main track could not be safely applied, by reason of the duty owed to passengers, if not to employés. *Phelps v. Railway Co.*, *ante*, 171. The plaintiff admits that he knew of this practice on defendant's road. It being the common practice upon railroads to thus locate structures, it cannot be negligence, for the test of negligence is, What is usual in railroading? and a trial court should not hesitate to say to a jury that it is not negligence for a railroad company to build or permit the erection and maintenance of coal-bins in close proximity to sidings, and that one who enters the employment of a railroad company must expect to find them and other structures, such as depots and their awnings, bridges, warehouses, water-tanks, elevators, etc., and that he assumes the risks incident to railroading in such places, in the night as well as the day, and the first time over the road as well as on subsequent trips. The brakeman must keep his eyes open for such obstructions, if he chooses to climb or work upon the cars, just as he should look out for trains approaching or standing upon an adjoining track when climbing a ladder on the side next such track.

There are cases which hold that an employé cannot be held to have assumed a risk of conditions that he has had no previous opportunity of becoming acquainted with. The leading case upon this subject appears to be *Dorsey v. Construction Co.*, 42 Wis. 583. In that case a cattle-chute was erected near the track, and a brakeman was drawn against it while climbing a ladder upon a car. It

was in plain sight, and the brakeman had frequently seen it; yet the court held that it did not follow that he was aware of danger, because it was not shown that he knew the precise distance between the chute and the car. A similar rule was applied in a case where the plaintiff was carried against a signal post erected between tracks. The court said he might not have known that it was near enough to do him injury, unless he had made actual measurements or calculation. *Johnson* v. *Railway Co.*, 43 Minn. 53. This is equivalent to holding that a brakeman may assume that there will be no obstruction within striking distance, and that until his attention has been called to the danger, or he has seen fit to ascertain the distance by measurement, he does not assume the risk of accident therefrom. We think these cases are at variance with the weight of authority, and the requirement of reasonable prudence on the part of employés.

One who engages in railroading may be presumed to understand the nature of the work he is entering upon, and, if he is not acquainted with the particular dangers of the line upon which he is to work, it is his duty to give attention to them. He must be on the lookout for buildings near the tracks, and to know what persons usually know of the uses of side tracks, and such dangers as naturally follow. A master has a right to expect ordinary caution, and need not point out dangers that will be seen and known but for inattention and thoughtlessness. It cannot be expected that he will give the employé a list of structures, and their respective distances from trains or tracks, or that he will send the newly-employed servant over the line and sidings with a rule, to measure them. He may assume that the structures will be seen, and that, when there is doubt about the exact distance from the track, the risk will be avoided. It is manifestly unsafe for one to attempt to pass between a building in close proximity to the track, and a car, especially on a dark night. This plaintiff was chargeable with knowledge that he was liable to encounter such buildings upon a

siding at the station, and, if it was so dark that the building was not easily discernible, increased vigilance was required.   It was unnecessary to walk upon that side of the car, if it was necessary to walk upon either side, and in so doing we think that the plaintiff assumed the risk of meeting this obstruction.

It may be urged that the overhang of the shed, and its position in relation to the track, show that it was out of repair, or a trap.   It is the common custom to set structures of all sorts nearer the track than was the topmost part of this bin; but it is unnecessary to pass upon these questions, as the plaintiff's testimony shows that he was not trapped, but walked against the end of the shed.

There is another point that should settle the case.   The proof shows that the plaintiff walked up to and against this shed, when he should have seen it.   It is evident that the man in front of him saw it in time to avoid it.   While it occurred in the night, there is no testimony that shows that it was so dark as to prevent the building from being seen before running against it.   The plaintiff's own testimony is that: "It was dark.   You couldn't see *much* of anything."   His witness Weirs said that: "It was a dark night.   Couldn't see *much* ahead of you.   I couldn't see an object more than 10 feet, to tell what it was."   William Wall said: "I could see an object the size of a man 10 feet away on that night, but I don't think you could have told who it was.   *Q.* When was your attention first called to the fact you could see a man 10 feet away?   *A.* I saw some of them going upon the track."   Lee Perry said: "I know the plaintiff.   I saw him in the depot after the accident, some time between 6 and 7 o'clock, standard time.   It was a very dark night.   It wasn't raining."   Elmer Settle said: "It was dark.   I couldn't really tell just where Pahlan was, but, as near as I can tell, he was right across from me, pushing.   It was a pretty dark night.   I saw them take him out from under the car.   I noticed the coal-shed."   The almanac shows that the moon was at the first quarter (*i. e.*, half full),

and set after 10 o'clock, upon that night. ,The plaintiff testified that he was pushing the car along, when his shoulder struck against the end of the coal-bin.   By his testimony we think it conclusively shown that he was negligent.

The court should have directed a verdict for the defendant.   Judgment reversed, and new trial ordered.

GRANT, C. J., and LONG, J., concurred.

MONTGOMERY and MOORE, JJ.   Because the case is controlled by *Phelps* v. *Railway Co.*, *ante*, 171, we concur in the opinion of Justice HOOKER.