DOYLE *v.* TOLEDO, SAGINAW & MUSKEGON RAILWAY CO

1. RAILROADS—INJURY TO EMPLOYÉ—SAFE PLACE TO WORK.
   Where a switch track ran under the shed of a brickkiln, the railroad company, though not owning the shed, owed its employés the duty of seeing that it was in a reasonably safe condition, in default of which it was liable to a brakeman for injuries sustained by the shed's falling upon him while he was coupling cars thereunder.

2. SAME—ASSUMPTION OF RISK.
   The doctrine of assumption of risk has no application to such a case, at least where the shed fell from its own weight.

Error to Gratiot; Stone, J. Submitted January 10, 1901. Decided June 17, 1901.

Case by James Doyle against the Toledo, Saginaw & Muskegon Railway Company for personal injuries. From a judgment for defendant on verdict directed by the court, plaintiff brings error. Reversed.

*Watson & Chapman*, for appellant.

*Geer & Williams* (*E. W. Meddaugh*, of counsel), for appellee.

MOORE, J. The plaintiff sued the defendant to recover for personal injuries received by him while in the employ of the defendant. The trial judge directed a verdict in favor of defendant. The case is brought here by writ of error.

The Sparta Brick & Tile Company is engaged near Sparta, and near the line of the defendant's road, in making bricks and tile. Its kilns are under a center building, upwards of 200 feet long. This building consists of posts set in the ground, and extending above the ground about 16 feet, upon the top of which are plates. The roof boards

extend from these plates to the center of the building, the highest point being midway between the rows of posts. On each side of the center building, and extending its entire length, is a lean-to, about 13 feet wide. The sides of the building are open. The outside of the lean-to is made of tamarack posts, 6 to 8 inches in diameter, set in the ground at intervals of 12 or 14 feet, and 12 feet high. On the tops of these posts plates are spiked. At frequent intervals rafters lead from the outside plates to the outside plates of the center building. The rafters are connected with each other by strips, some of which are 2 inches by 4 inches, and some 4 inches by 4 inches. Upon the tops of these strips, inch boards, 16 feet long, were nailed, reaching from the plates on top of the 12-foot posts to the plates on the center building. The boards on the center building were loose, and, when the fires were started in the kilns, were removed from the center building, and slipped over on the roof of the lean-to. The defendant company built a siding into the lean-to from its track over the land of the brick and tile company, which company loaded the cars from bricks which had been taken from the kilns, and which were sometimes piled in the lean-to while awaiting shipment. When the cars were loaded, usually, when the brakes were loosened, they could easily be run outside of the building, where they were received by the defendant company; but sometimes it was necessary to go into the building for them. The building was erected by the brick and tile company, and, so far as it was kept in repair, was repaired by them; the railroad company exercising no control over the building.

The plaintiff was 25 years old. He had been a brakeman nearly three years. He was in the employ of the defendant, and had made four trips over its road in the capacity of a brakeman on a freight train. These trips took him near the building in question. On December 28, 1898, the main part of the train was left near the station, while the locomotive and a box car were backed

upon the siding for the purpose of getting two flat cars that were under the lean-to. The plaintiff was instructed to make the coupling. While the train was moving slowly, he was attempting to remove the pin from a Jenney coupler, which was attached to the moving car, for the purpose of making the coupling when he should reach the cars under the shed. He had got but 8 to 18 feet into the shed, when a portion of the roof fell, and he received the injuries which are the cause of this litigation. It is his claim that it was the duty of the defendant to furnish him a reasonably safe place to work, and to keep this building in a reasonably safe condition, and that, not having done it, the company was guilty of negligence which gave him a cause for action. The negligence is stated in the declaration as follows:

"Plaintiff alleges that said defendant wholly failed to maintain said building in a reasonably safe condition, or in reasonable repair, but it allowed said building to become old, rotten, and worn out; the roof and rafters thereof become weak, and in such a condition that they would separate from whatever substance or thing they were attached to; that said building had stood so long, and was in such a condition, that it was rickety, and was liable at any minute to fall from its own weight, and it not being of sufficient strength to hold itself together, which condition was apparent to any one upon any reasonable examination of the same; and this plaintiff alleges that it was the duty of said defendant to have examined said building, and to have ascertained its condition, but that said defendant wholly failed and neglected to make any such examination."

The testimony offered by the plaintiff was to the effect that the building was not properly constructed in the first place, that it was old and weak, and that its condition was apparent to any one who would examine it, and that, about two years before the accident occurred, a portion of the roof had fallen. On the part of the defendant the testimony was to the effect that the building was well built, and was of the same character of construction usual for buildings erected for the purpose for which this was

used. The testimony showed that, when the portion of the roof fell about two years before the accident, its falling was occasioned by a heavy fall of snow coming upon a portion of the roof which was a part of an extension then in process of construction, before the posts and rafters were permanently in place; that the building had been in constant use by the employés of the brick and tile company, and that there was nothing in its appearance to indicate to any one there was any danger of its, falling. The lean-to was built to keep the rain off the side of the kiln, and from the bricks piled under the lean-to, and to protect the men when loading the cars. The shed was so low the locomotive could not be run under it. If refrigerator or furniture cars were run under it, they would hit against the rafters and boards, and a like result had occurred once or twice from the end of a brake rod on a high car hitting the roof. The evidence shows that the roof had been struck a week or two before the accident, but the injury had been repaired, and the roof left in perfect condition. It is not shown how the accident occurred, unless it is disclosed by the answer of Mr. Warner on the cross-examination as to what made the roof tumble, when he said, "I don't know of any reason, unless there had been an excessive weight of snow, or they struck it with their cars when they came in, as they had done before;" or the testimony of the fireman, who gave the signal to stop when the roof fell, that he saw Mr. Doyle coming out of the shed holding his left hand, apparently dazed, and that he was covered with snow.

Counsel for the plaintiff say:

"When the servant in Michigan accepts service from a master, there is a contract between him and the master that the master will furnish him with a reasonably safe place in which to work, and it is a duty that the master cannot shirk or charge to others than himself by contract, bargain, or any sleight of hand performance;" citing *Morton* v. *Railroad Co.*, 81 Mich. 423 (46 N. W. 111); *Van Dusen* v. *Letellier*, 78 Mich. 492 (44 N. W. 572);

*Johnson* v. *Spear*, 76 Mich. 139 (42 N. W. 1092, 15 Am. St. Rep. 298); *Adams* v. *Iron Cliffs Co.*, 78 Mich. 271 (44 N. W. 270, 18 Am. St. Rep. 441); *Hunn* v. *Railroad Co.*, 78 Mich. 513 (44 N. W. 502, 7 L. R. A. 500); *Harrison* v. *Railroad Co.*, 79 Mich. 409 (44 N. W. 1034, 19 Am. St. Rep. 180, 7 L. R. A. 623); *Brown* v. *Gilchrist*, 80 Mich. 56 (45 N. W. 82, 20 Am. St. Rep. 496); *Balhoff* v. *Railroad Co.*, 106 Mich. 606 (65 N. W. 592).

We have no doubt this proposition is fully sustained by the rulings of this court. Counsel say the same doctrine applies when a railroad company is using property belonging to another company or to some one else; citing 1 Shear. & R. Neg. § 196; *Wabash, etc., R. Co.* v. *Peyton*, 106 Ill. 534 (46 Am. Rep. 705); *Stetler* v. *Railway Co.*, 46 Wis. 497 (1 N. W. 112); *Id.*, 49 Wis. 609 (6 N. W. 303); and other cases.

It is insisted by defendant that an examination of these cases shows the defects resulting in the injury related to the roadbed itself, or to the train or its equipments, and for that reason do not apply to the case at bar. If the principle determined by these cases is to control, we think it cannot be said that the duty of the company to maintain a safe place for its employés to work is discharged if it leaves a structure over its tracks in so unsafe a condition as to imperil the safety of an employé whose duty it is while employed to pass under it. Was it, then, the duty of the company to its employés to see that this place where it built its track, and where it sent its employé to work, was reasonably safe? In *Ross* v. *Township of Ionia*, 104 Mich. 320 (62 N. W. 401), it was held, in effect, that, in building an approach to a bridge, the township authorities may not ignore surroundings, but are bound to exercise such caution as existing circumstances suggest. If the duty of maintaining this spur was a duty which the company owed to its employés, it will not do to say that this duty was performed by building a track which had no defects in itself, if there was that above the track which endangered the safety of the employé. The rule is established by the weight of authority that, when a rail-

road company runs its trains over tracks owned by another, the company is bound to see that the tracks are in a safe condition. *Stetler* v. *Railway Co.*, 46 Wis. 497 (1 N. W. 112); *Little Rock, etc., R. Co.* v. *Cagle*, 53 Ark. 347 (14 S. W. 89); *Wisconsin Central R. Co.* v. *Ross*, 142 Ill. 9 (31 N. E. 412, 34 Am. St. Rep. 49); *Murray* v. *Railroad Co.*, 66 Conn. 512 (34 Atl. 506, 32 L. R. A. 539). See, also, *Spaulding* v. *Granite Co.*, 159 Mass. 587 (34 N. E. 1134).

It is urged by counsel that, though they have not been able to find a case just like this, applying the principles announced in *Pahlan* v. *Railway Co.*, 122 Mich. 232 (81 N. W. 103), to this case, it justified the judge in directing a verdict in favor of defendant; counsel citing, also, *Carolan* v. *Southern Pacific Co.*, 84 Fed. 84. The *Pahlan Case* was determined upon the assumption of risk by the employé, who had knowledge of like conditions along the way of the company. The opinion of Justice HOOKER recognized that the company was bound to furnish a reasonably safe place to work. Nor is the case of *Carolan* v. *Southern Pacific Co.*, 84 Fed. 84, in point. In that case the question was whether the company was liable to an employé for injuries received by him because of the improper piling of boxes or freight on a wharf adjacent to defendant's track. The condition which caused the injury to plaintiff arose, not through an unsafe condition of the premises, but because of an improper use made of premises in proper condition, of which the plaintiff had notice. In the present case the plaintiff cannot be said to have assumed the risk that the building into which the company ran its track was liable to fall down upon him while in the performance of his duties. It is not a case in which the structure could be avoided, as in the *Pahlan Case*. If in any case an employé has a right to rely upon the performance of the duty to provide a safe place, it would seem that he may do so when he is called upon to pass under a building, to the extent, at least, of assuming that the building will not fall upon him by its own weight.

We think the case was one that should have been left to the jury under proper instructions from the court.

Judgment is reversed, and a new trial granted.

MONTGOMERY, C. J., and GRANT, J., concurred with MOORE, J. LONG, J., concurred in the result. HOOKER, J., did not sit.