# CASES

## ARGUED AND DETERMINED

### IN THE

# SUPREME COURT OF MINNESOTA.

---

IDA B. CLAY v. CHICAGO, MILWAUKEE & ST. PAUL RAILWAY COM-
PANY.[1]

March 27, 1908.

Nos. 15,327—(99).[2]

**Liability of Railway.**

While a railroad company has a right to construct its own road and
to solve its own engineering problems in accordance with its own views
and to determine what structures it will erect and at what places, it may
not, without liability, thereby violate rules of law for the protection of
passengers and employees.

**Risk not Assumed.**

It is the duty of a railway company to place its structures at a rea-
sonably safe distance from its tracks, so as not to be dangerous to brake-
men and other operatives upon the trains, or to warn them of such dan-
gers if they exist. Its employees are not presumed to assume the risk
of such perils, in the absence of notice. Johnson v. St. Paul, M. & M. Ry.
Co., 43 Minn. 53, followed and applied.

**Questions for Jury.**

Plaintiff, a minor, with only two months' experience as a freight
brakeman, during which he had stopped at a particular station at most
six times, was climbing down the side of a gondola pursuant to the or-
ders of the conductor, without warning of danger from railway struc-

---

[1] Reported in 115 N. W. 949.     [2] October, 1907, term calendar.

104 M.—1

tures. He was struck by a platform five to nine inches distant from the side of the car, and injured. It is *held*:

1. That the following questions were properly submitted to the jury: Whether the defendant was guilty of negligence "in regard to the location and construction of the freight platform, and in regard to ordering the plaintiff into a place of extraordinary hazard and danger without warning him" thereof, and

Whether plaintiff was guilty of contributory negligence, or assumed the risk, or had knowledge or notice of the peril to which he was exposed.

2. That the practical exoneration of the defendant conductor by verdict against the railway company only did not serve to conclusively show absence of negligence on the part of the railway company.

3. That no such violation of the master's rules was shown as to preclude recovery.

**Death of Plaintiff after Verdict.**

After verdict, plaintiff died. His mother, as administratrix, was substituted as plaintiff. It is *held* that section 4064, R. L. 1905, providing that, after a verdict, decision, or report of a referee fixing the amount of damages for a wrong, such action shall not abate by the death of either party, controls, and that section 4503 does not apply.

**Verdict not Excessive.**

The verdict of $35,000 for injuries which resulted in plaintiff's death is *held* not to have been so excessive as to indicate passion or prejudice.

**New Trial.**

Other errors considered, and *held* not to justify granting a new trial.

Action in the district court for Mower county to recover $50,000 for personal injuries. The case was tried before Kingsley, J., and a jury which returned a verdict in favor of plaintiff for $35,000. The plaintiff dying after the trial, the administratrix of his estate was substituted as plaintiff in his stead. From an order denying the alternative motion of defendant to vacate the verdict and to enter judgment in its favor notwithstanding the verdict or for a new trial, defendant appealed. Affirmed.

*S. D. Catherwood, Webber & Lees,* and *Chas. E. Vroman,* for appellant.

*Lovely & Dunn* and *Lafayette French,* for respondent.

JAGGARD, J.

Plaintiff was a head brakeman on a train of defendant and appellant railroad company. When the train arrived at the village of Lyle,

which is a station on that line of road, orders were given by the conductor to cut off the engine and a coal or flat car from the train, to go in on the side track, to load on some scrap iron, which was then alongside of the track, upon the flat car, and to put the car back into the train for the purpose of being transported to its destination. The flat car was accordingly cut off by the plaintiff. The engine, with it coupled thereto, passed up beyond the switch, and then backed down upon the side track until the engine and the car reached a box car which was standing upon the tracks at or in the vicinity of the elevator and coalhouse on the east side of the track. A coupling was made to this box car, and the engine and the two cars were then backed down to the point south of the depot and platform referred to, where the scrap iron was which was to be loaded upon the flat car. At that point the scrap iron was loaded onto the flat car, signals were given, and the engineer moved the engine forward again toward the switch at the north end of the side track. The conductor of the train, Mr. Bennett, stood upon the box car. His intention was, when the box car reached the point where it should be left, viz., the point from which it had been removed, that he would "spot" the car. Plaintiff was required to uncouple the box car from the flat car. The brake lever, an appliance which it became necessary for him to manipulate for the purpose of making the uncoupling, was located at the rear end of the flat car, and the handle of the lever was on the west side of that car—perhaps it is sufficiently accurate to say about the southwest corner of the car as it was then situated. There was a ladder and a stirrup, which were designed for the use of brakemen in climbing upon and getting down from cars of that character, and it appears that the plaintiff took a position upon this ladder for the purpose of performing his duty in uncoupling the cars, and when the car reached the platform which has been referred to he received the injuries, to recover damages for which he has brought this action.

This is substantially a part of the charge of the trial court. It will serve to clarify the record to amplify this statement. The platform in question was high enough to be on a level with the floor of an ordinary box car. There was testimony that there was only one other high platform on the Mason City division, and one on the I. & M. division. The car on which plaintiff was riding was nine and eight-tenths feet wide;

the ordinary car, nine and two-tenths feet wide. The edge of the platform was six feet from the center line of the house track. Its sharp corner projected within a few inches of the ladder rounds which plaintiff was using. According to one witness, the distance was five or six inches. There is an abundance of testimony that it was from six to nine and one half inches. When the accident occurred it was in the nighttime—dark. The platform lay in the shadow of an electric light, which light "caused it to be a dark place up in there. The light shines out from the front. It didn't give light to go around behind the depot at all. It is a dark hole right in behind the buildings." When plaintiff was hurt the lamps were lighted. The buildings thus referred to in the testimony as being opposite the platform were so near the track that the ordinary car would pass within two feet of them. There were other structures to the north and south of the platform where plaintiff was hurt.

The jury was justified in finding, further, that the engine, a gondola, and a standard box car passed down the side track. The intention was to separate and leave the box car at the coalhouse beyond the platform. To accomplish this the conductor's directions were that the engineer should give the cars a start, and that plaintiff should uncouple the standard from the gondola while in motion upon a signal from the conductor. The conductor, standing on the box car, was to "spot" the standard at the coalhouse with the hand brake. The first time he gave the signal for slack, plaintiff did not succeed in making the uncoupling. The cars were then started again. Plaintiff was waiting for the signal by the conductor, and, so as to be sure this time to catch the slack, held onto the ladder and stood in the stirrup as previously described. He was not expressly commanded to assume this position, but so to do was reasonably in pursuance of the direction thus given.

Eighteen days after the verdict plaintiff died. His mother, as administratrix, was substituted herein. The alternative motion for judgment notwithstanding the verdict or for a new trial was denied.

1. The first question on the merits concerns the defendant's negligence. The trial court submitted to the jury two bases of negligence: (a) "In regard to the location and construction of the freight platform," (b) "in regard to ordering the plaintiff into a place of extraordinary

hazard and danger·without warning him of the hazard to which he would be exposed thereby."

(a) The location of the platform, defendant insists, was a matter with which the jury had nothing to do, first, because the usual and proper location of the platform was, and is, primarily an engineering proposition, properly to be determined by the objects to be accomplished by its use and with just regard for the average safety of all employees whom it may concern; second, because the evidence in this case did not warrant the submission to the jury of such a case. The testimony tended to show that this platform had a clearance distance from the track equal to that habitually employed by defendant and other companies. Such clearance distance as existed here was greater than is prescribed by the rule promulgated by the railroad and warehouse commission for platforms for unloading grain. It conformed in height to the requirements of the statute. Section 2708, G. S. 1894; section 2003, R. L. 1905. That under these circumstances defendant was not actionably negligent in the solution of its engineering problem we are referred to a line of authorities of which Tuttle v. Detroit, G. H. & M. Ry. Co., 122 U. S. 189, 7 Sup. Ct. 1166, 30 L. Ed. 1114, may be regarded as typical. At page 194 of 122 U. S., page 1168 of 7 Sup. Ct. (30 L. Ed. 1114), Mr. Justice Bradley said: "Although it appears that the curve was a very sharp one at the place where the accident happened, yet we do not think that public policy requires the courts to lay down any rule of law to restrict a railroad company as to the curves it shall use in its freight depots and yards, where the safety of passengers and the public is not involved; much less that it should be left to the varying and uncertain opinions of jurors to determine such an engineering question." See also Boyd v. Harris, 176 Pa. St. 484, 489, 35 Atl. 22 (cattle chute too close to a side track); St. Louis v. Burns, 97 Ill. App. 175, 178; Mobile v. Healy, 100 Ill. App. 586, s. c. 109 Ill. App. 531 (two railway tracks separated by too narrow a space); Illick v. Flint, 67 Mich. 632, 35 N. W. 708 (too narrow bridge).

This theory is plainly not applicable to the case at bar. No justification of compliance with statutory requirements as to clearance distance between the platform and cars was made out. No peculiarity of circumstance removed this case from the ordinary requirement of the

exercise of reasonable care to provide a safe place for work of servants. In general, a railroad has the right to construct its own road, to solve its own engineering problems in accordance with its own views, and, more specifically, to determine what structures it will erect and at what places. It by no means follows that it may disregard rules of law for the protection of the public, passengers, or employees. If on a track, over bridges, and through tunnels, on a scale current in early railroading, it were attempted to run modern trains, disaster would be as inevitable as liability would be certain. The fact that a platform in existence for half a century had proven safe and satisfactory has no tendency whatever to show that it would be safe one moment after a material change had occurred in conditions. If, in the case at bar, the car had been a few inches wider, and had crashed into the platform and injured the switching crew and freight handlers on the platform, in the absence of contributory negligence or assumption of risk, a case of actionable negligence would have been clearly made out. The proximity of the platform to the track may, as a matter of law, be negligent or careful, or the negligence of its erection may be a question of fact, according to the circumstances of each particular case. This case involved no engineering problem of technical character. As Judge Hammond said in 112 Fed. 888, 50 C. C. A. 591, approved in Choctaw, O. & G. R. Co. v. McDade, 191 U. S. 64, 67, 24 Sup. Ct. 24, 25, 48 L. Ed. 96: "It [the matter of erecting a waterspout so as to provide a safe clearance] is so simple a task, one so devoid of all exigencies of expense, necessity, or convenience, so free of any consideration of skill except that of the foot rule, and so entirely destitute of any element of choice or selection, that not to make such a construction safe for the brakeman on the trains is a conviction of negligence." And see 4 Thompson, Neg. § 4315. The authorities subsequently considered in connection with assumption of risk and contributory negligence fully sustain this view. It is to be immediately noted that Tuttle v. Detroit, G. H. & M. Ry. Co., supra, was called to the attention of the supreme court in argument in Texas & Pac. Ry. Co. v. Swearingen, 196 U. S. 51, 25 Sup. Ct. 164, 49 L. Ed. 382. A conclusion consistent with plaintiff's right to recover here was none the less reached.

(b) Defendants insist that the hazard to which he was exposed was ordinary. The distinction between ordinary and extraordinary hazards is familiar, the ideas are simple, and the terms self-explanatory. It would avail nothing to enlarge upon them here. It is obvious that the proximity of the obstruction to the car would constitute an ordinary or an extraordinary hazard, as a matter of law or as a question of fact, according to the circumstances of each particular case. It would be stultification to hold here as a matter of law that a clearance distance of only six and one half inches between the platform and the ladder of the car on which a minor employee, without warning, was riding, pursuant to the direction of his conductor, was an ordinary hazard. The trial court was justified in submitting the matter to the jury.

2. The second question on the merits is whether as a matter of law plaintiff was guilty of contributory negligence, or assumed the risk, because he knew, or ought to have known of the hazard of the platform and to have apprehended its danger. There was testimony, defendant insists, that plaintiff had frequently been in position in which he had a clear and unobstructed view of that platform, and that on the very night on which he was hurt he was in position for observation, and he could by use of his lantern easily have seen the platform in question. Plaintiff's trip should have been one of continual and industrious discovery. He made it one of industrious blindness and indifference. Accordingly he should not be allowed to recover, even if his exposed position brought him unusually near the platform. McLeod v. New York, 191 Mass. 389, 77 N. E. 715, 114 Am. St. 628. And see Sisco v. Lehigh, 145 N. Y. 296, 39 N. E. 958; Chicago v. Clark, 108 Ill. 113.

The Michigan rule is quite clear that obstructions abutting side tracks "are usually necessary for the conduct of railroad business, and in making up trains brakemen and switchmen must be on the lookout for them. While, where they abut on the main track, and not in yards where trains are usually made up, servants of railroads may expect that such obstacles will not be placed in so close proximity to the track as to make them dangerous." See Pahlan v. Detroit, 122 Mich. 232, 81 N. W. 103; Phelps v. Chicago, 122 Mich. 171, 178, 81 N. W. 101, 84 N. W. 66. The Michigan cases have been criticised

as involving "a wire-drawn differentiation" (1 Labatt, Master & Servant, footnote, p. 151), and have been regarded as requiring the "limit of excessive diligence and caution" on the servant's part (5 Thompson, Neg. § 5561).

The theory of the trial court in submitting both questions to the jury was clearly in accord with the opinions of the supreme court of the United States. In Choctaw, O. & G. R. Co. v. McDade, 191 U. S. 64, 24 Sup. Ct. 24, 48 L. Ed. 96, a brakeman was killed as a result of being struck by an iron spout. Mr. Justice Day said (at page 68 of 191 U. S., page 25 of 24 Sup. Ct. [48 L. Ed. 96]): "The servant has the right to assume that the master has used due diligence to provide suitable appliances in the operation of his business, and he does not assume the risk of the employer's negligence in performing such duties. The employee is not obliged to pass judgment upon the employer's methods of transacting his business, but may assume that reasonable care will be used in furnishing the appliances necessary for its operation. * * * The charge of the court upon the assumption of risk was more favorable to the plaintiff in error than the law required, as it exonerated the railroad company from fault if, in the exercise of ordinary care, McDade might have discovered the danger. Upon this question the true test is, not in the exercise of care to discover dangers, but whether the defect is known or plainly observable by the employee. Texas & Pacific Ry. Co. v. Archibald, 170 U. S. 665."

In Texas & Pac. Ry. Co. v. Swearingen, 196 U. S. 51, 25 Sup. Ct. 164, 49 L. Ed. 382, a state of facts curiously similar to those presented on this appeal was presented. Plaintiff, a switchman, was injured by striking a scale box alleged to have been in dangerous proximity to the switch track down which plaintiff was riding on the ladder of a box car. He was looking for a signal from his superior, and had a lantern, substantially as here. The tracks and scale were "standard," with a space of less than two feet for the movement of a switchman between the side of a car and the scale box. Plaintiff knew the proximity of the scale box to the switch track, but did not closely inspect it or take measurements of the situation. Mr. Justice White said, inter alia, "that the dangerous contiguity of the scale box to track No. 2 and the extra hazard to switchmen therefrom was not so open

and obvious on other than a close inspection as to justify taking from the jury the determination of the question whether there had been an assumption of the risk. The plaintiff was entitled to assume that the defendant company had used due care to provide a reasonably safe. place for the doing by him of the work for which he had been employed, and, as the fact that the defendant company might not have performed such duty in respect to the scale box in question was not so patent as to be readily observable, the court could not declare, in view of the testimony of the plaintiff as to his actual want of knowledge of the danger, that he had assumed the hazard incident to the actual situation. * * * Knowledge of the increased hazard resulting from the dangerous proximity of the scale box to the north rail of track No. 2 could not be imputed to the plaintiff simply because he was aware of the existence and general location of the scale box. It was for the jury to determine, from a consideration of all the facts and circumstances in evidence, whether plaintiff had actual knowledge of the danger."

The general rule throughout the states accords with these opinions. Many of them will be found well arranged in 31 Am. & Eng. Ry. Cas. (N. S.) 548, note. And see Louisville v. Hall, 115 Ky. 567, 74 S. W. 280. The rule in this state accords. Flanders v. Chicago, St. P., M. & O. Ry. Co., 51 Minn. 193, 53 N. W. 544; Johnson v. St. Paul, M. & M. Ry. Co., 43 Minn. 53, 44 N. W. 884; Robel v. Chicago, M. & St. P. Ry. Co., 35 Minn. 84, 27 N. W. 305; Campbell v. Railway Transfer Co., 95 Minn. 375, 104 N. W. 547. Chief Justice Ryan, in Dorsey v. Phillips, 42 Wis. 583, with characteristic clearness and force stated the reason for this rule: "The safety of railroad trains depends largely upon the exclusive attention of those operating them to the track and to the trains themselves. It is not for the interest of railroad companies, or of the public—with like, if not equal, concern in the safety of trains—that persons so employed should be charged with any duty or necessity to divert their attention. And it appears to us very doubtful whether persons operating railroad trains, and passing adjacent objects in rapid motion, with their attention fixed upon their duties, ought, without express proof of knowledge, to be charged with notice of the precise relation of such objects to the track. And, even with actual notice of the dangerous proximity of adjacent objects,

it may well be doubted whether it would be reasonable to expect them, while engaged in their duties, to retain constantly in their minds an accurate profile of the route of their employment and of collateral places and things, so as to be always chargeable, as well by night as by day, with notice of the precise relation of the train to adjacent objects. In the case of objects so near the track as to be possibly dangerous, such a course might well divert their attention from their duty on the train to their own safety in performing it." This view of the law accords better with the opinions of the supreme court of the United States, supra, delivered in 1903 and 1904, respectively, than the later and more or less inconsistent decisions of the supreme court of Wisconsin. See Pahlan v. Detroit, 122 Mich. 232, 81 N. W. 104, and Scidmore v. Milwaukee, 89 Wis. 188, 61 N. W. 765 (rendered, respectively, in 1899 and 1894).

The application of these principles to the case at bar permits no doubt that the instructions of the trial court were as favorable to the defendants as could reasonably have been. The court fully and fairly charged that the plaintiff assumed the ordinary, but not the extraordinary, hazards and risks of his employment; that if an order was given, and the plaintiff had knowledge or notice that to execute the order would expose him to unusual or extraordinary danger, he would assume the risk and danger incident thereto, and he might not recover for injuries so sustained. Plaintiff denied actual knowledge. It must be assumed that the jury believed him. Within the views thus expressed, the court was clearly right in submitting to the jury the question of notice to him. Plaintiff, a minor, had had no experience in this line of duty, except two months' service as a freight brakeman. He had passed by and had stopped at Lyle only four or six times. For part of this time he had been on this branch of the road, and claimed that his "work had been performed in another part of the yard." He had a right, in the performance of his duties, which occupied his attention in giving and receiving signals, watching the loading and unloading of freight at depots, and the like, to assume, especially in view of the direction of his superior officer, that the master had not been guilty of negligence, and was not required by law to make a detailed and exact study of the facilities his master had provided.

3. The third question on the merits is whether plaintiff was precluded from recovery because he had violated defendant's rules, with which he was familiar. Of these, rule 28 is as follows: "Engines or cars must not be detached from a train while the train is moving." The court construed this rule as if "it refers to the movement of the train, and I do not think, taking the rules as a whole, that it was intended to apply, or that it does apply, to a brakeman who is engaged in switching on a side track." The general rules and special instructions in the return bear out this construction. It is provided, for example, that "in switching passenger train equipment cars must not be detached from the train while in motion." Inferentially, in cutting or switching freight train equipment, cars may be cut off while in motion. It is evident from the rules as a whole, that the term "train," as here used, did not refer to an engine and cars used in switching operations, but to the movements on the main line of a train from one station to another in the due course of transportation. Rule 2 is as follows: "You are forbidden to work on the side of cars or trains where there are buildings, sheds, cattle chutes, or other projecting structures. Always work on that side where there are no buildings or structures, and in getting on or off, or in riding on the side of moving cars, do so only at places where there are no obstructions alongside the track, such as buildings, structures, lumber piles, etc., that will make such work hazardous." The court charged the jury that "if the plaintiff had notice or knowledge of the fact that this platform existed there * * * and that it was a dangerous platform * * * he cannot recover in this action, because in that event * * * he was riding at a place on the car in violation of his contract and the rule of the company." This was a proper question of fact under the evidence; hence plaintiff could not properly have been held, as a matter of law, to have violated this rule.

In this connection plaintiff introduced some evidence tending to show that the rules had been habitually disregarded. We refer to that evidence only because its admission has been assigned as error. It was certainly competent for the plaintiff to show the abandonment of the rules. Alabama v. Bonner (Ala.) 39 South. 619. A recent and able summary of the law in this regard will be found in St. Louis v. Caraway, 77 Ark. 405, 91 S. W. 749. The only question here on this point

is whether there was evidence enough of this kind to make out a case in this regard. The conclusion reached is the more convincing, in view of another consideration. Defendant's candor has compelled it to admit that it is a matter of common understanding that in switching yards cars are commonly uncoupled while in motion for the purpose of "kicking" them down the track unaccompanied by the engine. The universality of this custom is attested by scores of reported cases adjudicating the rights of parties to such casualties. The jury in this case believed that plaintiff had been directed to do so by the conductor. It is clear, in view of the previous discussion of the applicable rules, that plaintiff was not, as a matter of law, precluded from recovery because he acted, not only with the conductor's knowledge and acquiescence, but also reasonably in pursuance of the master's special · command. Tullis v. Lake Erie & W. R. Co., 105 Fed. 554, 44 C. C. A. 597, at page 601.

4. The defendant insists that the verdict, being against the defendant railroad company only, exonerated Bennett, the conductor, and thereby exonerated this defendant likewise, and that the court, therefore, erred in not granting defendant's motion for judgment notwithstanding the verdict. The argument is that the company had warned the plaintiff generally as to structures like the platform in question, that this was all it could do in the way of giving warning, that the breach of duty to warn was Bennett's, and that, if Bennett were not liable, the company could not be liable, for any failure to warn. In this connection reference has been made to many cases which show that, if the only negligence to warn was that of Bennett, the failure of the jury to return a verdict against Bennett entitled the defendant to a directed verdict. In this particular case, however, the court submitted the question to the jury "whether it was the duty of the defendant Bennett" "that he inform the plaintiff of this platform or of its relation to the side track." It further charged that he [Bennett] was "simply required to exercise ordinary care in regard to that. * * * In passing upon the question of his negligence, you have a right to consider what knowledge he may have had in regard to the plaintiff's previous experience as a freight brakeman, and especially in regard to his service on this particular line of road." The submission of this issue to the jury in this manner was not made the

subject of specific objection, exception, or assignment of error. In view of Bennett's testimony as to his knowledge of plaintiff's experience, and of the absence of evidence that it was Bennett's especial duty to warn plaintiff, it is clear that defendant was not entitled on this account to a directed verdict. See Clark v. City of Austin, 38 Minn. 487, 489, 38 N. W. 615; Thompson v. Chicago, St. P. & K. C. Ry. Co., 71 Minn. 89, 73 N. W. 707.

5. The next question on the merits concerns the abatement of the action. · Defendant insists that the verdict should have been set aside and a new trial awarded under section 4503, R. L. 1905. That section is part of the local Lord Campbell's act. The particular proviso is: "Provided, that if an action for such injury shall have been commenced by such decedent, and not finally determined during his life, it may be continued by his personal representative for the benefit of the same persons and for recovery of the same damages as herein provided, and the court on motion may make an order allowing such continuance, and directing pleadings to be made and issues framed conformably to the practice in actions begun under this section." This proviso did not mean that the personal representative of the deceased ·may be substituted in the action commenced by the intestate, and prosecute his cause of action for damages for the benefit of the widow and next of kin, which would otherwise die with him. It authorizes the personal representative of the deceased, where the evidence warrants it, to be substituted as plaintiff in the original action brought by him, and to convert the action, by amendment of the pleadings, into an action for the benefit of the widow and next of kin. It does not authorize any such substitution for the purpose of prosecuting the original cause of action which accrued to the deceased in his lifetime. Anderson v. Fielding, 92 Minn. 42, 99 N. W. 357, 104 Am. St. 665. Where, however, the cause of action which accrued to the injured person during his lifetime has been made the basis of an action to recover damages, and a verdict for the damages has been awarded therein, the effect of the death of the plaintiff is not governed by section 4503, but by the general sections governing ordinary civil actions. Under section 4064 it is provided, inter alia, that after the verdict, decision, or report of a referee fixing the amount of damages for a wrong, such action shall not abate by the death of any party thereto. Section

4503 applies where the plaintiff dies before verdict, and where the damages are unliquidated and unascertained, as in Anderson v. Fielding, 92 Minn. 42, 99 N. W. 357, 104 Am. St. 665. Section 4064 applies where damages have been liquidated and ascertained by the verdict. The verdict becomes property and passes to the representatives, the same as though it had been reduced to judgment. Cooper v. St. Paul City Ry. Co., 55 Minn. 134, 56 N. W. 588; Kent v. Chapel, 67 Minn. 420, 70 N. W. 2. The substitution in this case of the mother of the minor did not abate the action nor justify vacating the verdict.

6. Defendant also insists that the verdict of $35,000 is so excessive as to indicate passion or prejudice. There is no dispute that plaintiff's injuries resulted in indescribable anguish and in death. They were as serious as they could possibly have been. That they were necessarily fatal, or that only $5,000 could have been recovered by his administrator for the next of kin, does not constitute any reason whatever for holding the verdict improper. It has never been the law in this court that, the worse a servant is hurt by his master's negligence, the less he can recover. The fact that death was likely to result does not diminish the extent of the proper recovery. Plaintiff, surviving the casualty, had a cause of action totally different from that of his administrator on his death. See Mageau v. Great Northern Ry. Co., 103 Minn. 290, 115 N. W. 651. For his injury he was entitled to compensation. The greater the injury, the larger should the verdict be. In the present case, calculations of the value of the verdict, intelligently invested, show that the verdict was not unreasonable upon a strictly pecuniary basis. We know of no reason or authority for disturbing the verdict of this jury which the trial court refused to set aside. See Hall v. Chicago, B. & N. R. Co., 46 Minn. 439, 49 N. W. 239; Texas v. Kelly, 34 Tex. Civ. App. 21, 80 S. W. 1073; Gulf v. Shelton, 30 Tex. Civ. App. 72, 69 S. W. 653; Morhard v. Richmond, 111 App. Div. 353, 98 N. Y. Supp. 124; Smith v. Whittier, 95 Cal. 279, 30 Pac. 529; Huggard v. Glucose, 132 Iowa, 724, 109 N. W. 475; Retan v. Lake Shore, 94 Mich. 146, 53 N. W. 1094.

7. Because of the inconvenience, if not the impossibility, on account of plaintiff's physical condition, of having him in court at the trial, the judge, jury, and counsel repaired to his home and there took his testimony. At its close, despite defendant's objection, his

body was uncovered and exposed to the jury. Defendant argues that the purpose of this view was not to instruct the jury as to the character of the injuries which they could not see, but to excite their sympathies. Even in this aspect, no prejudicial error appears; for the damages are not excessive. The objection, moreover, was not to taking the testimony of the witness at his house. In course of the testimony there was as much propriety in permitting defendant to exhibit his body as there would have been in the ordinary case in open court.

8. A number of other assignments of error call for no extended discussion. The admission of evidence to show the feasibility of cutting doors in the end of the depot, so as to dispense with the platform; the instruction of the court as to statutory platforms, and its refusal to charge, as defendants requested on this point, practically that he could not recover because of proximity of platform, if error at all, which we doubt, was error without prejudice. The court repeatedly charged that the basis of actionable neglect was the proximity of the box car to the side of the platform and the failure to warn. That the platform was built in the wrong place was not the basis of defendant's negligence. So also if the court submitted to the jury some questions which it should have decided as of law, no prejudice appears. These and other assignments of error have been considered and found not to constitute reversible error.

Affirmed.