## BINGHAM MINES CO. v. BIANCO.

(Circuit Court of Appeals, Eighth Circuit. October 18, 1921.)

No. 5644.

1. **Death** ⊂⊃54—**Consent of widow to action by administrator must be questioned by plea.**

   In an action by an administrator for the benefit of the widow and children to recover damages for the death of his intestate, the failure of plaintiff to prove that the widow consented to his bringing the action does not entitle defendant to a directed verdict, where it had failed to give notice in any way by its answer that it desired such proof to be made.

2. **Master and servant** ⊂⊃217(15)—**Risk from unguarded electric wire assumed by miner knowing danger.**

   An experienced miner, 29 years old, who had worked six months in a drift containing an unprotected electric trolley wire five feet above the floor level at the place where he worked, and who knew of the existence

of the wire and appreciated the danger of coming in contact with it, and had been warned of the danger, *held* to have assumed the risk.

3. **Evidence** ⟪⇒354(8)—**Time book and reports of master held admissible against him.**

In an action for the death of a servant, the time book and report kept by the employees of defendant in the course of its business were competent on behalf of the servant to show he was employed on dates specified therein.

4. **Witnesses** ⟪⇒406—**Time book and report showing decedent's employment on stated date held admissible in contradiction.**

Where defendant in an action for the death of a servant had introduced evidence that on a certain date decedent had a fit in the witness' store, to show that his death may have resulted from such a fit, a time book and report showing that on the date specified decedent was employed by defendant and was not in the store of the witness was admissible in contradiction of the witness' testimony.

In Error to the District Court of the United States for the District of Utah; Tillman D. Johnson, Judge.

Action by Domenico Bianco, as administrator, etc., against the Bingham Mines Company. Judgment for the plaintiff, and defendant brings error. Reversed and remanded for new trial.

Mahlon E. Wilson, of Salt Lake City, Utah, for plaintiff in error.

Culbert L. Olson, of Salt Lake City, Utah, for defendant in error.

Before CARLAND, Circuit Judge, and LEWIS and YOUMANS, District Judges.

YOUMANS, District Judge. Defendant in error, hereafter called plaintiff, as administrator of the estate of James Ozzello, deceased, brought suit against plaintiff in error, hereafter called defendant, for damages for the death of James Ozzello, alleged to have been caused by the negligence of defendant. Plaintiff recovered judgment for the benefit of the widow and two minor children of Ozzello. Defendant brings error to reverse that judgment.

On or about October 13, 1914, James Ozzello was employed by defendant in the underground workings of its mine. At the time of the injury which resulted in his death, Ozzello was engaged in loading ore cars with ore and waste at an ore chute known as chute No. 9 in a certain drift of defendant's mine.

The ore cars were moved into and out of the drift by means of an electric motor. The electric power for it was furnished through a trolley wire that was extended into the drift.

Plaintiff alleged and introduced proof tending to show that this wire was extended at a height of five feet and two inches above the floor level of the drift at the place where Ozzello was working. The motor was operated by a motorman who controlled the electric power used to propel the motor. The ore cars were moved by the motor into the drift near No. 9 chute and left there to be loaded with ore and waste. When the cars were so placed, the motor was disconnected therefrom and moved to another part of the mine. It was the duty of Ozzello to load the cars with ore or waste and to couple them up when so loaded.

---

⟪⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Ozzello had been engaged in this work for six months. The wire was bare and unguarded. No one was present at the time the injury was sustained.

James Airole testified as follows:

"I had worked in No. 9 stope 13 or 14 months before the accident. The cars were hauled in and out of the mine with a motor. The motor had a trolley pole and the pole ran along the wire; it tipped to the wire side. The mucker loaded the cars at chute No. 9. Jim Ozzello was doing that on the date of the accident. He went into work after 7 in the morning. He went with me up the manway into the stope 150 feet above the drift and worked there all day. When I came off shift, I came down this manway. On other occasions before the accident, I had seen Jim Ozzello loading cars at the chute. He would raise the board and let the ore come out of the chute, and stand by the chute, and when the car was loaded, he would push it ahead. He sometimes loaded six, sometimes seven, sometimes ten, sometimes four cars. The empty cars would be standing near the manway. He would push the loaded car ahead, then go and get an empty car and load it with ore and push it up, and I don't know how he got to couple them up. After they were all loaded, the motor would come in and take them out. On the date of the accident, in the afternoon, we quit work about half past 3 and changed our clothes up there. My partner was Jim Procarione. We came down about 20 minutes to 4. The chute and manway are divided by partitions. We came down the manway. We brought buckets, a saw, and an ax, and put them on the skip and ran the skip from the top up there and down the manway. The buckets, saw, and ax were ahead of us, and we came down on the right side of the manway or the middle. When I came down the manway, I saw James Ozzello. He was pushing an empty car under the chute. I was then about 10 feet up the manway. I said to him: 'How many cars have you got to load, Jim?' And he said: 'This is the last one.' I was then 10 feet up the manway. * * * The motor was not there at that time. It came in about 10 minutes later. We talked until the motor came in, and asked: 'Where did Jim go?' We were standing to the right of the manway, some little distance. My partner asked: 'Where Jim go?' The motorman connected onto the train, and pulled the cars out. We stayed there a minute or two, right on the track. The cars stopped, the last car being about 15 or 20 feet from the ore chute. I do not know exactly. We stopped behind the car, two or three feet. We saw Jim Ozello dead on the side, on the left-hand side going out. Ozzello's arm was over the track, and a wheel of the car was on top of his arm. The body was lying on the belly, with head turned to the left side of the drift, with the right side of his face down, the left hand lying along the left side, and the right arm extending over the track at about the elbow; the body being directly under the trolley wire on the left-hand side of the drift looking out, or where the trolley wire would come. The hind wheel of the car was on his arm at about the elbow; the hind wheel was off the track between the rails on the ground. Ozzello was dead. * * * I had worked around No. 9 chute about two years. Ozzello had been there about six or seven months, maybe more. He had been there four or five or six months, almost every day. * * *

"The place where we found the body of Ozzello was 15 or 20 feet from the ore chute; went to work in the drift above the manway about 7:30 and worked there until along in the afternoon, and then started to come down, about 20 minutes to 4. We quit at half past 3 and then started down. I did not look at my watch any more. When we got down it was about 15 minutes to 4. I was in the manway when I saw Ozello about 10 feet above the drift. He was pushing the car under the chute, and that was when he said: 'This is the last car I have got to load.' There was no car under the chute at that time. He was right behind the empty car pushing it up under the chute. I saw him quit pushing it. I was then coming down the manway. I didn't see where he went. He put the car under the chute, and the last time I saw him, before I saw him dead, he was standing behind the car. * * *

I had a lamp with me; Jim Ozzello had his lamp. Ozzello had to pass the car on the left-hand side of the drift going out. I did not see him go down on either side. I did not see him after he left the car. Nobody can pass on the right-hand side of the car, going down the drift. I saw the trolley wire there. I did not see it when I was in the manway looking at him. I saw it when I got down. I knew it was there; had seen it in the morning and saw it every day. If a man would raise his lamp, he could see it. When a man has his lamp lit, he has got to look where he puts his feet, but if he raised his lamp he could see it."

The facts stated by Airole were corroborated by other witnesses. Bert Sorossi, shift boss, testified for the defendant as follows:

"I knew James Ozzello. I was present at the time his body was found on the track. He had been working there about nine months in and about No. 9 chute; been working about six months; he had been working about nine months steadily off and on. He worked six months under the other shift boss, and three months under the witness shift boss. I had known him a little over nine months. I went in when I heard he was killed; saw his dead body lying on the ground. It was about 15 feet below No. 9 chute. * * * I had some talk with him a few days before the accident. I see he had a pick and shovel. He was going up there in the stope. I said to him: 'Better look out, Jim, the wire is charged there.' He said to me: 'Yes, I look for that.' "

The complaint alleges that defendant was negligent in the following particulars:

"(a) That the defendant carelessly and negligently maintained said trolley wire in said drift at an insufficient elevation, to wit, at a height of about five feet and two inches above the floor level of the drift at such points in the drift and about the ore chute where the deceased was performing his work that the deceased was thereby unnecessarily and carelessly exposed to the danger of contact with said wire.

"(b) That the defendant carelessly and negligently failed and neglected to protect said trolley wire from being exposed to contact with the deceased and other workmen similarly employed by it.

"(c) That the defendant carelessly and negligently caused and permitted said trolley wire to carry an unnecessarily high and dangerous voltage of electric pressure, to wit, 500 volts.

"(d) That the defendant carelessly and negligently caused and permitted said trolley wire to be charged with electricity while the deceased was engaged in the performance of his work.

"(e) That the defendant carelessly and negligently failed and neglected to adopt and enforce any measure, or promulgate and enforce any rule or regulation, to prevent or prohibit its motorman or other person intrusted by the defendant with the operation of electric switches and the control of electric power in its said mine, from causing said trolley wire to be charged with said electric power while the deceased was engaged in the performance of his work."

The answer denied the allegations of negligence. In addition, the affirmative defenses were set up of (a) contributory negligence (b) assumption of risk, and (c) injury by a fellow servant.

At the conclusion of the testimony defendant moved the court to instruct the jury to return a verdict in its favor on the following grounds:

(1) The failure of the evidence to show that plaintiff had the consent of the wife and children to bring the suit.

(2) The failure of the evidence to show negligence.

(3) The failure of the evidence to show the death was caused by electricity.

(4) That the testimony showed that Ozzello assumed the risk of coming in contact with the wire.

(5) That the testimony showed contributory negligence on the part of the deceased.

This motion was overruled, which action of the court is assigned as error.

[1] With regard to the contention of defendant that the evidence did not show that the widow and minor children had given their consent to the bringing of the suit, it is sufficient to say that this defense was not set up in the answer. Such proof was waived by defendant when it failed to give notice in some way that it desired this showing to be made in order that it might be protected against another suit on the same cause of action by the widow or minor children.

This case is unlike that of Spokane, etc., Railroad Co., v. Whitley, 237 U. S. 487, 35 Sup. Ct. 655, 59 L. Ed. 1060, L. R. A. 1915F, 736, relied on by defendant. In that case Josephine Whitley, as administratrix of the estate of her husband, A. P. Whitley, brought suit for damages for the negligent killing of her husband. Under the laws of Idaho, the state in which the cause of action arose, the widow and mother were the heirs of the deceased. In her complaint the widow did not allege that the mother was an heir under the laws of Idaho, or that any recovery was sought on her behalf. The railroad company in its answer set up as an affirmative defense that the mother had sued in Idaho as one of the heirs, and that if the plaintiff succeeded the defendant would be exposed to a double recovery. In the instant case the complaint shows that the suit was brought for the benefit of the widow and children. By a proper plea the plaintiff would have been notified of the contention of defendant and would have had the opportunity of securing proof of the consent of the widow and children. The trial court committed no error in refusing an instructed verdict upon that ground.

[2] In considering the defense of assumption of risk, the question is whether in view of his age, intelligence, and experience Ozzello knew of the existence of the wire, that it transmitted a current of electricity, and that he appreciated the danger that would result in coming in contact with it. He was 29 years of age. He had worked in that drift six months, and in addition he had been warned of the danger. The conclusion must be that he assumed the risk.

In the case of Chicago, B. & Q. R. Co. v. Shalstrom, 195 Fed. 725–728, 115 C. C. A. 515, 45 L. R. A. (N. S.) 387, the following rules are laid down for the determination of assumed risk:

"1. A servant by entering and continuing in the employment of a master without complaint assumes the ordinary risks and dangers of the employment and the extraordinary risks and dangers thereof which he knows and appreciates."

"2. Although the risk of the master's negligence and of its effect unknown to the servant is not one of the ordinary risks of the employment which he assumes, yet if the negligence of the master or its effect is known and appreciated by the servant, or is obvious, or 'so patent as to be readily ob-

served by him by the reasonable use of his senses, having in view his age, intelligence, and experience,' and he enters and continues in the employment without objection, he elects to assume the risk of it, and he cannot recover for the damages it causes."

"3. When a defect is obvious or 'so patent as to be readily observed by a servant by the reasonable use of his senses, having in view his age, intelligence' and experience,' and the danger and risk from it are apparent, he cannot be heard to say that he did not realize or appreciate them."

"4. No duty rests on the master to warn a servant of defects, risks, or dangers that are 'so patent as to be readily observed by him by the reasonable use of his senses, having in view his age, intelligence and experience.'"

In the case of Butler v. Frazee, 211 U. S. 459, 29 Sup. Ct. 136, 53 L. Ed. 281, Mr. Justice Moody, speaking for the court, said:

"The visible conditions may have been of recent origin, and the danger arising from them may have been obscure. In such cases, and perhaps others that could be stated, the question of the assumption of the risk is plainly for the jury. But where the conditions are constant and of long standing, and the danger is one that is suggested by the common knowledge which all possess, and both the conditions and the dangers are obvious to the common understanding, and the employee is of full age, intelligence, and adequate experience, and all these elements of the problem appear without contradiction from the plaintiff's own evidence, the question becomes one of law for the decision of the court. Upon such a state of the evidence a verdict for the plaintiff cannot be sustained, and it is the duty of the judge presiding at the trial to instruct the jury accordingly."

In the case of Southern Pacific Co. v. Berkshire, 254 U. S. 415, 41 Sup. Ct. 162, 65 L. Ed. ——, decided by the Supreme Court of the United States January 3, 1921, the facts were stated by Mr. Justice Holmes, speaking for the court, as follows:

"The facts so far as made definite by the evidence are not in dispute. Linder was employed by the defendant as an engineer upon a train running from El Paso, Tex., to Deming, N. M. At Carney, in New Mexico, he was found sitting on his engineer's seat, unconscious, with his right arm and pretty nearly half of his body outside of the cab, leaning with the right side and arm over the arm rest of the engine. There was a cut about an inch over the right ear. He had been struck by the end of a mail crane, or a mail sack that had been placed on it to be picked up by a mail train following Linder's which was an extra carrying soldiers. In order to have uniformity the Post Office Department fixes the distance of the cranes from the equipment, and the length of the hooks, so that, in the language of a witness for the plaintiff, 'the same hook that will take a sack off a crane in Arizona or New Mexico will take it as it goes through Western Kansas.' The evidence was all to the effect that this crane stood at the same distance as all the others along the road. The end of the crane when elevated was not nearer to the train than fourteen inches, but might have been found to be as near as that, and therefore near enough to be capable of hitting a person leaning out of the window, as indeed was shown by the event.

"Linder had been upon this route for some years, had passed over it many times and must be presumed to have known of the crane. It was visible from the engineer's seat, half a mile ahead, through a front window. About a mile before reaching Carney Linder had noticed that the main driving pin on the engine was getting hot, had crept out upon the running board to see about it, and had returned. It may be supposed that at the time of the accident he was leaning out of the side window to look at it again and was acting in the course of his duty. The position in which his body was first seen and the place of the wound indicate that he was more than fourteen inches out from the engine's side.

"In this case the question is not whether a reasonable insurance against such misfortunes should not be thrown upon the traveling public through the railroads, or whether it always is possible for a railroad employee to exercise what would be called due care for his own safety and to do what he is hired to do. The question is whether the railroad is liable under the statute according to the principles of the common law regarding tort. The first element in it is the standard of conduct to be laid down for the road. The standard concerns a permanent condition not only at this place, but at many places along the road and presumably at innumerable others on all the large railroads of the United States. There are no special circumstances to qualify this part of the question—which is whether or not it is consistent with the duty of a railroad to its employees to erect railroad cranes of which the end of the arm when in use is 14 inches from the side of the train. The railroad is required and presumed to know its duty in the matter and it would seem that the court ought to be equally well informed. It cannot be that the theory of the law requires it to be left to the uncertain judgment of a jury in every case. See Southern Pacific Co. v. Pool, 160 U. S. 438, 440, 16 Sup. Ct. 338, 40 L. Ed. 485. * * *

"But further, we must take it, as we have said, that Linder perfectly well knew of the existence of the crane where it stood, and could have seen it from his seat had he looked, long before he reached it. He entered the employment of the railroad when it had this appliance manifest in its place. The only element of danger that he may not have appreciated was the precise distance which the point of the crane would reach. But an experienced railroad man cannot be supposed to have been ignorant that such a projection threatened danger and, knowing so much, he assumed the risk that obviously would attend taking the chances of leaning well out from the train. As we have said, the only possible inference on the uncontradicted evidence of the plaintiff's witnesses was that he leaned out considerably more than fourteen inches as shown by the position of his body and the place of the cut on his head. The probability is that the distance of the crane was somewhat greater than the minimum that we have assumed, but that we lay on one side. Confining ourselves to the case of postal cranes we are of opinion that to allow the jury to find a verdict for the plaintiff was to allow them to substitute sympathy for evidence and to impose a standard of conduct that had no warrant in the common law. Butler v. Frazee, 211 U. S. 459, 465-467; Kenney v. Middaugh, 118 Fed. 209."

See, also, McAdoo, Director General of Railroads, v. Anzellotti (C. C. A. 2d Circuit) 271 Fed. 268.

The court erred in refusing to give to the jury a peremptory instruction on the ground of assumption of risk.

[3] The court permitted the plaintiff to introduce in testimony on rebuttal over objection of defendant the time book furnished by the defendant company for the months of August and September, 1914, which showed the name of Ozzello and the dates on which he was working in the month of September, 1914. This time book was introduced by the plaintiff for the purpose of showing that Ozzello was at work in the mine and was not in the store of the witness Fahrni who had previously testified for the defendant that Ozzello had a fit in his store during the month of September, 1914.

[4] The court also permitted the plaintiff to introduce in testimony on rebuttal, over the objection of the defendant, a daily report of the foreman in defendant's mine. This report was introduced by plaintiff to show that upon September 22, 1914, Ozzello was at work in the mine and was not at Fahrni's store. The time book and report, having been made by employees of defendant in the course of its business, were competent for the purpose of showing where Ozzello was

on the dates indicated, to contradict the statement of the witness who testified that on a certain occasion Ozzello had a fit in his store. The object of the defendant in introducing Fahrni's testimony was to show that Ozzello was subject to fits and that his death was occasioned by his falling down in a fit in the drift and being run over by the loaded ore cars. It was not error to admit this testimony.

For the error in refusing to instruct the jury to return a verdict for the defendant on the ground of the assumption of risk, the cause is reversed and remanded for a new trial.